# BEC CORPORATION ET AL. *v.* DEPARTMENT OF ENVIRONMENTAL PROTECTION
## (SC 16174)

McDonald, C. J., and Borden, Norcott, Sullivan and Vertefeuille, Js.*

* Although Chief Justice McDonald reached the mandatory age of retirement before the date that this opinion was officially released, his continued participation on this panel is authorized by General Statutes § 51-198 (c). The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued September 22, 2000—officially released July 10, 2001

*William F. Gallagher*, with whom, on the brief, was *Barbara L. Cox*, for the appellants (plaintiffs).

*David H. Wrinn*, assistant attorney general, with whom were *Mary K. Lenehan*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellee (defendant).

*Eric Lukingbeal* and *Richard M. Fil* filed a brief for the Connecticut Business and Industry Association, Inc., as amicus curiae.

*Opinion*

MCDONALD, C. J. The issue raised in this appeal is whether the trial court properly held that the officers of BEC Corporation (BEC), Irvin A. Shiner and Michael Shiner, are personally liable under the Connecticut Water Pollution Control Act, General Statutes § 22a-416 et seq. (act). The plaintiffs, BEC, Irvin A. Shiner,[1] the

---

[1] Irvin A. Shiner, one of the plaintiffs in the appeal of the department's order to the trial court, is deceased, and, pursuant to General Statutes § 52-599, his executors have been substituted as appellants in the present appeal.

president of BEC, and Michael Shiner, the vice president and secretary of BEC, appeal from the judgment of the trial court dismissing their administrative appeal from the decision of the defendant, the department of environmental protection (department). On June 6, 1996, the commissioner of the department, pursuant to § 22a-416, issued an abatement order regarding BEC's real property located in West Haven. The commissioner found that the plaintiffs, BEC, and Irvin A. Shiner and Michael Shiner individually, created or were maintaining a facility or condition that reasonably could be expected to pollute the waters of the state, and ordered that BEC, Irvin A. Shiner and Michael Shiner "shall be jointly and severally liable for compliance with this order." The commissioner, pursuant to General Statutes § 22a-432,[2] ordered the plaintiffs to prevent further pollution at the site, to investigate existing and potential pollution at the site, to undertake remedial actions to abate that pollution, and to monitor the effectiveness of those remedial actions.

---

[2] General Statutes § 22a-432 provides: "If the commissioner finds that any person has established a facility or created a condition before or after June 25, 1985, or is maintaining any facility or condition which reasonably can be expected to create a source of pollution to the waters of the state, he may issue an order to such person to take the necessary steps to correct such potential source of pollution. Any person who receives an order pursuant to this section shall have the right to a hearing and an appeal in the same manner as is provided in sections 22a-436 and 22a-437. If the commissioner finds that the recipient of any such order fails to comply therewith, he may request the Attorney General to bring an action in the superior court for the judicial district of Hartford to enjoin such person from maintaining such potential source of pollution to the waters of the state or to take the necessary steps to correct such potential source of pollution. All actions brought by the Attorney General pursuant to the provisions of this section shall have precedence in the order of trial as provided in section 52-191. An innocent landowner, as defined in section 22a-452d, shall not be held liable, except through imposition of a lien against the contaminated real estate under section 22a-452a, for any order issued under this section on or before August 1, 1990, which order is subject to appeal as of July 6, 1995, and, after July 1, 1996, for any order issued under this section after July 1, 1996."

The plaintiffs appealed to an administrative hearing officer from the commissioner's decision to issue the abatement order. Before the hearing officer, Irvin A. Shiner and Michael Shiner argued that, even if BEC were liable under § 22a-432 as set forth in the order, they could not be held personally liable. The hearing officer rejected this argument and affirmed the commissioner's order. The plaintiffs appealed from this administrative decision to the trial court pursuant to General Statutes § 4-183.[3] The trial court upheld the hearing officer's decision and dismissed the appeal, and the plaintiffs appealed to the Appellate Court. Thereafter, we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. We affirm the judgment of the trial court.

The administrative hearing officer who considered the plaintiffs' appeal from the abatement order found the following relevant facts: BEC, a Connecticut corporation, owns real property located at 101-105 Water Street in West Haven (site). The site is bordered on the west by Water Street, on the east by the confluence of the West River and New Haven Harbor, and on the north

---

[3] General Statutes § 4-183 provides in relevant part: "(a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. . . .

"(j) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal and, if appropriate, may render a judgment under subsection (k) of this section or remand the case for further proceedings. For purposes of this section, a remand is a final judgment. . . ."

and south by private property. BEC or its corporate predecessors operated an oil storage and distribution business from the site from as early as 1944 to approximately May 15, 1995. The site includes a barge docking facility for the unloading of oil barges, above ground oil storage tanks, and piping to carry oil from the barge docking facility to the oil storage tanks and for loading oil from the tanks into oil tanker trucks. In addition, the site includes an office building, warehouse, garage and other structures.

The oil storage tanks are located on pilings in a row in the northwest corner of the site near Water Street. Four of the tanks hold 15,000 barrels of oil each, and one tank holds 5000 barrels. A barrel is equivalent to forty-two gallons. The tanks are surrounded by a concrete dike and the concrete foundation of a structure on the neighboring property. The five tanks, the dike and the foundation wall surrounding the tanks and the unpaved floor beneath the tanks in the diked area are referred to as the "tank farm." An intermittent spring runs through the tank farm, and the floor of the tank farm is wet and frequently covered in water from both that spring and precipitation. Water in the tank farm is drained by a manually operated pump that empties oil into an oil/water separator.

The site, until approximately 1988, also had a tank farm and loading rack on the southeast corner of the property (former tank farm). The former tank farm included five above ground oil storage tanks, two having the capacity of 20,000 barrels each and three having a 15,000 barrel capacity. The floor of the former tank farm was unpaved, and the tank closest to the West River was surrounded by several inches of water during high tide. After the former tank farm was removed, its location was paved over and converted to a dry-docking facility.

The site has a high water table as evidenced by the spring in the tank farm, the wet floor of the tank farm and the former tank farm, and the site's proximity to the West River. The site's proximity to New Haven Harbor subjects the groundwater underlying the site to tidal influences.

The site was purchased by the Connecticut Refining Company (Connecticut Refining) on or about December 29, 1944. Connecticut Refining merged with the Benzoline Energy Company (Benzoline) on December 3, 1986. The surviving corporation retained the name Benzoline Energy Company. On May 9, 1995, Benzoline changed its name to BEC Corporation. Subsequently, BEC discharged all of its employees and sold all of its assets with the exception of the real property at 101-105 Water Street, including its tank farm and on-site buildings. The assets were sold to Alliance Energy Corporation (Alliance), which leased the office building on the site from BEC but did not operate an oil terminal at the site.

Connecticut Refining was formed by Irvin A. Shiner's father, Edward Shiner. Irvin A. Shiner assumed control as president of Connecticut Refining from his father in approximately 1968, and he retained that position until Connecticut Refining's merger with Benzoline. He was president of Benzoline prior to its merger with Connecticut Refining and remained so until Benzoline's name changed to BEC in 1995. He was BEC's president from 1995 until his death on September 16, 1999. He owned or co-owned 100 percent of its voting stock. Irvin A. Shiner supervised the day-to-day operations of Connecticut Refining and Benzoline and made most of the major decisions regarding their operations. He performed in the same capacity with BEC. In performing those duties, Irvin A. Shiner typically had been at the site no fewer than five days a week, except for vacations, from 1968 until 1995.

Michael Shiner served as vice president and secretary of Connecticut Refining and then Benzoline from approximately 1975 to May 9, 1995. He has been vice president and secretary of BEC since 1995. Michael Shiner reported directly to his father, Irvin A. Shiner, and in his absence Michael Shiner was in charge of the company's operations and typically was on the site five days a week.

In the late 1980s, Michael Shiner assumed greater responsibility for supervising the day-to-day operations at the site, although Irvin A. Shiner remained involved in major corporate and operational decisions. Since approximately 1973, Michael Shiner oversaw the company's environmental compliance. In that capacity, he coordinated the preparation of spill prevention control and countermeasure plans, and communicated with environmental enforcement agencies such as the department and the United States Coast Guard (Coast Guard). During environmental inspections of the site, Michael Shiner generally would accompany the government inspectors.

Since the early 1970s, it was the policy of Connecticut Refining and its successor companies that employees notify either Irvin A. Shiner or Michael Shiner of oil releases at the site. Michael Shiner coordinated the response to the spills. Irvin A. Shiner was at the site within twenty-four hours of every oil release since 1970, except for one release in 1992, which occurred while he was away on vacation.

There has been a history of oil spills on the site, including several spills that occurred around the former tank farm that was located in the southeast corner of the site. On or about October 5, 1971, approximately 900 gallons of oil spilled onto the floor of the former tank farm when one of its tanks overflowed during the unloading of an oil barge. The oil on the floor of the

former tank farm was collected by means of absorbent material and a vacuum truck, but no soils were removed from the site of the former tank farm or remediated following that incident.

In August, 1977, oil was observed leaching into the West River from the vicinity of the bulkhead in the northeast corner of the site. Michael Shiner engaged a private contractor to locate the source of the discharge and clean it up. The contractor installed a boom, which is a floating containment barrier used to contain floating oil, to contain and remove the oil that had leached into the river. The contractor also installed an oil collection system to collect the oil in the soils and prevent additional oil from leaching into the West River. The contractor determined that the oil was coming from a leaking underground pipe, which subsequently was replaced with an above ground pipe. Some oil-soaked soils also were removed from the vicinity of the leak. Despite those remedial efforts, oil continued to leach into the West River. The oil collection system was expanded and enlarged, but the leaching continued.

In October, 1978, the Coast Guard determined that the efforts of Connecticut Refining were not preventing oil from leaching into the West River, and took over the cleanup efforts. The Coast Guard collected the oil leaching into the West River, pumped out the collection pits dug by the contractor, and dug a series of test pits that revealed large amounts of oil in the area of the former tank farm. On October 6, 1978, the Coast Guard discovered that the source of that oil was a leaking underground pipe near the former tank farm's loading rack. In the period from October 5 to October 16, 1978, the Coast Guard recovered more than 2832 gallons of oil from the site. Following the Coast Guard's discovery of the second leak, Connecticut Refining replaced the remaining underground piping at the site at the direction of the Coast Guard and the department. No addi-

tional sampling or investigation of the soils in the vicinity of the leaks was conducted at that time.

Thereafter, on or about December 2, 1984, the tank closest to the West River in the former tank farm overflowed during the unloading of an oil barge. Four hundred gallons of oil were released into, and immediately outside of, the former tank farm, with oil spraying into the West River. Michael Shiner was called to the site by Connecticut Refining employees, and he contacted a private contractor, East Coast Environmental (East Coast), to clean up the spill. East Coast removed some of the surface soils from inside of and around the former tank farm, and used a boom to contain the oil that had sprayed into the West River. No analysis or remediation of the soils in the vicinity of the spill was conducted after the East Coast cleanup was completed.

Spills also occurred around the current tank farm that is located in the northwest corner of the site. On or about December 26, 1992, a valve on one of the tanks froze and cracked, causing 35,000 to 40,000 gallons of oil to spill onto the floor of the tank farm. The department's oil and chemical spill response division (response division) was notified of the spill on that date, and when response division staff arrived at the site, they observed six to twelve inches of oil covering the floor of the tank farm. Oil from that release penetrated the soils of the tank farm. On the day of the release, Michael Shiner contracted with a private contractor, National Oil (National), to clean up the release. National pumped out the oil and water mixture within the dike area of the tank farm later that day, and removed and replaced some of the soils within the tank farm two or three weeks later. Following that incident none of the soil remaining in the tank farm was examined for potential contamination, and no additional remediation of the release was performed after National completed its cleanup. Following the National cleanup,

Benzoline employees noticed that water pumped out of the tank farm had an oily sheen. Benzoline then installed an oil/water separator inside the tank farm to remove that oil on a continuous basis.

In March, 1995, Irvin A. Shiner and Michael Shiner decided to have the tanks in the tank farm removed from the site. To facilitate the removal of the remaining oil in the tanks and to allow prospective removal contractors to view the inside of the tanks, it was necessary to have the manway covers removed from each of the tanks. The manway covers were removed in March, 1995. After the manway covers were removed and the usable oil in each tank was pumped out, approximately 7000 gallons of sludge, which is the solids and sediments in oil, and an additional amount of a mixture of oil and water, remained in each tank. Both of the Shiners knew that the tanks contained this sludge and oil and water mixture. Thomas Melin, a former BEC employee then employed by Alliance, informed Michael Shiner in April, 1995, that the manually operated pump, which drained the accumulated water in the tank farm, should be operated to keep the tank farm from filling with water. Michael Shiner assured Melin that the pump would be turned on, but neither turned the pump on himself nor made arrangements that it be done after the manway covers were removed. Following heavy rains on April 21, 1996, the water level in the tank farm rose above the level of the open manways, allowing approximately 20,000 gallons of the oil and water mixture in the tanks to escape onto the water-covered floor of the tank farm. Melin reported the release to the response division at approximately 8:45 a.m. on the day of the release. When the response division staff arrived at the site at approximately 9:45 a.m., the water level in the tank farm was still above the level of the open manways.

The response division, after consultations with Irvin A. Shiner at the site that morning, contacted a private

environmental contractor, American Environmental Technology (American), to clean up the site. American arrived at the site by noon and under the response division's supervision removed over 90 percent of the liquid from the floor of the tank farm by the end of the day. The liquid removed included both water already inside the diked area of the tank farm and the oil and water mixture that had escaped from the tanks. The next day, American removed the remaining liquid from the tank farm floor and began draining the pipes that led from the barge area to the tanks and from the tanks to the loading racks. Between April 23, 1996, and May 6, 1996, American drained the remaining contents of the pipes and tanks and reinstalled the manway covers. Despite the removal of liquid from the diked area, oil stains remained on the inside of the dike wall, indicating that the oil and water mixture had saturated the dike wall and had seeped into the soils within the tank farm. Neither American, the response division, nor the plaintiffs analyzed the soils within or immediately outside the tank farm for potential contamination after the April 21, 1996 release, nor did they undertake any remediation of the area after American's cleanup.

On July 25, 1997, the response division received two reports of an oil sheen in the vicinity of the site. One of those reports was filed by an attorney representing BEC, who indicated that BEC accepted financial responsibility for cleaning up the sheen. John Porter, a staff member of the response division, arrived at the site that morning and observed that the bulkhead in the northeast corner of the site had partially collapsed. The bulkhead, a wooden structure that separated the site from the West River, was designed to stabilize the shoreline and protect the site's soils from being eroded by the river current. Porter observed that water from the West River had entered the site behind the collapsed bulkhead and that an oil sheen made up of fewer than

ten gallons of oil had formed on both sides of the collapsed bulkhead. Shortly after Porter arrived at the site, he was met by Irvin A. Shiner. Irvin A. Shiner then called Michael Shiner, who arrived soon thereafter. After consulting with Porter, Michael Shiner arranged for a private contractor to clean up the sheen. The response division determined that the sheen resulted from contaminated soils behind the bulkhead coming into contact with the waters of the West River after the bulkhead collapsed.

The hearing officer also found the following facts regarding the consequence of the oil releases. "Oil released onto an earthen floor will penetrate the ground and enter the subsurface soils. . . . Once oil enters the subsurface soils it will travel downward and outward in an inverse conical pattern. . . . Some of the released oil may become trapped between the soil surface and the water table, some of it may be absorbed by soil particles, some of it may reach the groundwater and flow downgradient to the receiving surface water body, and some of it may migrate through the groundwater to the underlying soil. . . . Oil absorbed by subsurface soil particles or trapped among them will remain there until either it is chemically degraded by microorganisms or it evaporates. . . .

"Oil released directly into the subsurface soils . . . will migrate underground in the same manner as an above-ground release that has entered the subsurface soils through an earthen surface. . . .

"Once in the subsurface soils, an oil release will continue to spread outward and downward over time. The amount of oil in the soil, however, will decrease as a result of degradation (by microorganisms) and/or evaporation. . . . Soil contamination resulting from more recent spills will, therefore, tend to be more concentrated and localized than soil contamination resulting

from an older spill of an equivalent amount of oil released under similar conditions. . . .

"In general, the greater amount of oil released, the larger the area of soil contamination which will result. . . .

"Oil discharged into a surface water body, such as the spring in the tank farm . . . will reach the water table faster, and thus travel further, than oil released onto dry ground. Oil spilled or leaked onto the ground in an area with a high water table, such as the site . . . will also travel faster and further than a spill or leak in an area with a lower water table. Tidal influences, such as those at the site . . . can reverse groundwater flows; an oil release in a location subject to tidal influences will therefore have a more extensive and complicated pattern of soil contamination than a similar oil release in an area without tidal influences. . . .

"Because water is denser than oil, oil released into a water body will tend to float if the water body is calm. However, oil does dissolve in water, and that dissolution process begins immediately upon the release of the oil into the water. The more the water body is disturbed ([for example] by wind, tides or cleanup activities), the faster the oil will dissolve." (Citations omitted.)

The hearing officer concluded that, because of the history of spills at the site, a hydrogeologic investigation[4] was the only way to determine the extent and nature of soil and water contamination at the site. Accordingly, the hearing officer affirmed the commissioner's order. The order required the plaintiffs to replace the manway covers, repair the dike wall surrounding the oil storage tanks, cease storage of oil in

---

[4] According to the hearing officer's memorandum of decision, "[a] hydrogeologic investigation examines geologic, ground water and surface water conditions to determine the nature and extent of soil and water pollution at a specific location."

the tanks, submit a plan to treat and remove all surface water that accumulates on the site before remediation is completed, perform a hydrogeologic investigation of the site, and, using the results of that investigation, propose and implement remedial actions to abate the pollution and monitor the effectiveness of remedial activities. The hearing officer determined that the Shiners personally could be held liable for the investigation and remediation.

On the plaintiffs' appeal to the trial court, that court concluded that the hearing officer's factual findings were supported by substantial evidence in the record. The court also affirmed the hearing officer's finding of personal liability as to Irvin A. Shiner and Michael Shiner. At trial, the Shiners had argued that, in order for them to be held personally liable under § 22a-432, the department was required to pierce the corporate veil. The court rejected that argument, and held that the individual plaintiffs were liable under § 22a-432 and the "responsible corporate officer doctrine." This appeal followed.

On appeal to this court, the plaintiffs claim that the trial court improperly affirmed the hearing officer's decision that Irvin A. Shiner and Michael Shiner personally are liable.[5] The department argues, to the contrary, that the individual plaintiffs strictly are liable under § 22a-432, and, relying on *Matter of Dougherty*, 482 N.W.2d 485, 490 (Minn. App. 1992), that the Shiners personally are liable under the "responsible corporate officer doctrine" as applied in that case. We agree with the department that the individual plaintiffs personally are liable under § 22a-432 because, by its terms, that section adopts a responsible corporate officer doctrine.

We begin by articulating the applicable standard of review in an appeal from the decision of an administra-

---

[5] BEC does not dispute its liability under the order, and, accordingly, we do not address that issue.

tive agency. "Judicial review of [an administrative agency's] action is governed by the Uniform Administrative Procedure Act (General Statutes, c. 54, §§ 4-166 through 4-189), and the scope of that review is very restricted." (Internal quotation marks omitted.) *New Haven* v. *Freedom of Information Commission*, 205 Conn. 767, 773, 535 A.2d 1297 (1988). "With regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency." (Internal quotation marks omitted.) *Griffin Hospital* v. *Commission on Hospitals & Health Care*, 200 Conn. 489, 496, 512 A.2d 199, appeal dismissed, 479 U.S. 1023, 107 S. Ct. 781, 93 L. Ed. 2d 819 (1986). "Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, 243 Conn. 635, 642, 708 A.2d 202 (1998).

The present appeal presents a question of law: whether the individual plaintiffs, as corporate officers, may be held personally liable under § 22a-432. This question previously has not been subjected to judicial scrutiny. The agency's decision, therefore, is not entitled to special deference. Id., 643.

The resolution of this issue rests upon an interpretation of § 22a-432 and General Statutes § 22a-423. Section 22a-432 provides in relevant part that "[i]f the

commissioner finds that *any person* has established a facility or created a condition . . . or is maintaining any facility or condition which reasonably can be expected to create a source of pollution to the waters of the state, he may issue an order to such person to take the necessary steps to correct such potential source of pollution."[6] (Emphasis added.)

Section 22a-423 provides in relevant part that " 'person' means any individual, partnership, association, firm, limited liability company, corporation or other entity, except a municipality, and includes the federal government, the state or any instrumentality of the state, and *any officer* or governing or managing body *of any* partnership, association, firm or *corporation* or any member or manager of a limited liability company . . . ." (Emphasis added.) Thus, the language of § 22a-423 strongly suggests that the legislature intended that corporate officers may be held liable under § 22a-432 under appropriate circumstances. See footnote 7 of this opinion. Initially we conclude, therefore, that under § 22a-432, the mere fact that a "person" who is polluting is a corporate officer does not automatically shield that officer from liability for his own actions or omissions.

We next address the issue of when, or under what circumstances, a corporate officer is liable under § 22a-432. The trial court relied on the "responsible corporate officer doctrine" as articulated by the Minnesota

---

[6] The act, as originally enacted, provided in part that the commissioner could issue an abatement order to " 'any person . . . maintaining any facility or condition which can reasonably be expected to create a source of pollution to the waters of the state.' " *Starr* v. *Commissioner of Environmental Protection*, 226 Conn. 358, 385, 627 A.2d 1296 (1993). In 1984, the legislature, by enacting Public Acts 1984, No. 84-239, § 1, amended § 22a-432 to include any person who " 'has *established* . . . or *created*' . . . a condition . . . ." (Emphasis in original.) Id., 385–86. The amendment expanded § 22a-432 "to reach not only landowners who were passively maintaining a nuisance but also those who had actively created or established a source of pollution." Id., 386.

Supreme Court in *Matter of Dougherty*, supra, 482 N.W.2d 485, in finding the corporate officers liable. In *Matter of Dougherty*, the court concluded that liability may be imposed upon a corporate officer for strict liability public welfare offenses if the following three elements are established: "(1) the individual must be in a position of responsibility which allows the person to influence corporate policies or activities; (2) there must be a nexus between the individual's position and the violation in question such that the individual could have influenced the corporate actions which constituted the violations; and (3) the individual's actions or inactions facilitated the violations." Id., 490.[7] In large part, we adopt the language of *Matter of Dougherty* in defining the liability of corporate officers under the act.

We hold that a corporate officer is personally liable for the abatement of a violation of § 22a-432 when: (1) the officer is in a position of responsibility that allows that officer to influence corporate policies and activities; (2) there is a nexus between the officer's actions or inactions in that position and the violation of § 22a-432 such that the corporate officer influenced the corporate actions that constituted the violation; and (3) the corporate officer's actions or inactions resulted in the violation.

We emphasize that we are by no means establishing the responsibility of corporate officers in general with respect to corporate activity; we restrict the application of the responsible corporate officer doctrine solely to violations of the act. Furthermore, we point out that a corporate officer's liability under the act is not tantamount to vicarious liability where the corporate officer

---

[7] In *Matter of Dougherty*, the defendant argued that application of the responsible corporate officer doctrine was not intended under Minnesota hazardous waste laws because the definition of a "person" liable under the Minnesota environmental act did not include, as does § 22a-423 of our act, an officer of a corporation.

may be held liable simply because the officer occupies the position of officer or director; rather, we hold that a corporate officer's conduct must have a responsible relationship to a violation of the act. Cf. *United States* v. *Park*, 421 U.S. 658, 95 S. Ct. 1903, 44 L. Ed. 2d 489 (1975) (responsible corporate officer will not be held liable solely because of individual's position within corporation); *United States* v. *Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 744 (8th Cir. 1986), cert. denied, 484 U.S. 848, 108 S. Ct. 146, 98 L. Ed. 2d 102 (1987) (corporate officer's liability premised upon personal involvement, not on official position); *Scribner* v. *O'Brien, Inc.*, 169 Conn. 389, 404, 363 A.2d 160 (1975). "[A]n officer of a corporation does not incur personal liability for its torts merely because of his official position"; *Scribner* v. *O'Brien, Inc.*, supra, 404; but if an "officer [of a corporation] commits or participates in the commission of a tort, whether or not he acts on behalf of his . . . corporation, he is liable to third persons injured thereby." Id.

We also point out that a corporate officer's direct liability under the act is distinct from derivative liability when the corporate veil is pierced. The officer's liability does not depend on a finding that the corporation is inadequately capitalized, that the corporate form is being used to perpetrate a fraud, or that corporate formalities have not been honored. See *Kilduff* v. *Adams, Inc.*, 219 Conn. 314, 331, 593 A.2d 314 (1991) ("we conclude that it was unnecessary to pierce the corporate veil in order to find that the [corporate officers] were personally liable for their misrepresentations"); 3A W. Fletcher, Cyclopedia of the Law of Private Corporations (Cum. Sup. 2000) § 1135; 18B Am. Jur. 2d 723, Corporations § 1877 (1985).

We further conclude that, under the act, a corporate officer may be liable for pollution resulting from omissions as well as from affirmative acts. In *Starr* v. *Com-*

*missioner of Environmental Protection,* 226 Conn. 358, 382, 627 A.2d 1296 (1993), we concluded that "§ 22a-432 appears to have been intended to track and incorporate the common law of public nuisance. By declaring that 'the pollution of the waters of the state is inimical to the public health, safety and welfare of the inhabitants of the state, [and] a *public nuisance'* . . . in General Statutes § 22a-422, the legislature appears to have assimilated, where appropriate, the common law of nuisance into the act. The common law, and particularly the law of public nuisance at the time of the passage of [the act], figured prominently in water pollution control and had set the stage for legislation concerning abatement of water pollution." (Emphasis in original.)

Under the common-law tort of nuisance, not only an act but also an omission may form the basis for liability. "The conduct necessary to make the actor liable for . . . a public nuisance or a private nuisance may consist of (a) an act; or (b) a failure to act under circumstances in which the actor is under a duty to take positive action to prevent or abate the interference with the public interest." 4 Restatement (Second), Torts, Nuisance § 824, p. 116 (1979).

The plaintiffs argue that Irvin A. Shiner and Michael Shiner should not be personally liable under § 22a-432 unless they physically spilled oil onto the ground or refused to obey an order to remediate after a spill. We do not agree. Although it is true that a corporate officer is not personally liable simply by virtue of having supervisory authority when a corporation's employee may cause pollution, if the corporate officer's actions or inactions create conditions that "reasonably can be expected to create a source" of water pollution, then that officer may be held personally liable under § 22a-432.

The plaintiffs rely on *United States* v. *Bestfoods,* 524 U.S. 51, 55, 118 S. Ct. 1876, 147 L. Ed. 2d 43 (1998),

to support their argument that they may not be held individually liable under § 22a-432. The plaintiffs' reliance on *Bestfoods* is misplaced. The dispute in *Bestfoods* was over "the extent to which parent corporations may be held liable under [the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. (CERCLA)] for operating facilities ostensibly under the control of their subsidiaries." *United States* v. *Bestfoods*, supra, 60. Under CERCLA, "any person who *operates* a polluting facility is directly liable for the costs of cleaning up the pollution." (Emphasis added.) Id., 65. The court in *Bestfoods* concluded that, "under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." Id., 66–67. Thus, the United States Supreme Court held that only an "operator" may be subject to *direct* liability for a violation of CERCLA on the basis of his control over "decisions about compliance with environmental regulations," in the absence of *derivative* liability that results from piercing the corporate veil. Id. It concluded that a parent corporation is not ipso facto such an operator. Id.[8]

Our conclusion that the individual plaintiffs personally are liable under § 22a-432 is supported by the broad remedial purpose of the act, which is to protect the

---

[8] Indeed, even the *Bestfoods* definition of an operator is met in the present case. The Shiners personally may be liable under § 22a-432 because of their management, direction and conduct of operations having to do with the leakage or discharge of fuel oil into the waters of the state and their decisions about compliance with environmental regulations at the fuel oil facility.

waters of the state from pollution. In *Starr*, we noted that the act was enacted to remedy "an inadequate statutory scheme especially as it pertained to the [water resources] commission's authority to order the abatement of existing sources of pollution." *Starr* v. *Commissioner of Environmental Protection*, supra, 226 Conn. 378. The act was a "declaration of war against water pollution," and it was intended to "usher . . . in a new era in the treatment of our water resources. It embodies the concept that no one, whether individual, industry or community, has the right or privilege to render our water resources unusable by pollution." (Internal quotation marks omitted.) Id., 376, quoting Connecticut's Clean Water Act of 1967: An Analysis of Public Act 57, p. 2. In *Starr*, we emphasized that the legislature "resolved the various concerns engendered by § 22a-432 against the landowner and in favor of the public and clean water"; *Starr* v. *Commissioner of Environmental Protection*, supra, 393; and that, by declaring water pollution to be a "public nuisance," the act sought to achieve "clean water [despite] possible individual hardship . . . ." Id., 394.

We have said that we will liberally construe the act to effectuate its purposes. Id., 382. We have recognized that the legislature intended that § 22a-432 "enable the commissioner, in order to achieve the act's remedial purposes, to impose liability on all those who, in some way, have responsibility towards the land." Id., 388. Imposing liability upon only corporations and not the individuals causing the harm to the environment would undermine the act's purposes. "Statutes are to be construed in a manner that will not thwart [their] intended purpose . . . ." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Sullivan Associates*, 250 Conn. 763, 778, 739 A.2d 238 (1999).

Our decision is consistent with an emerging body of federal case law holding individual corporate officers liable for violations of federal environmental laws when those officers either participated in those violations, controlled or supervised the corporate activities that resulted in the violations, or had the power to prevent violations from occurring and failed to exercise that power. See, e.g., *United States* v. *Northeastern Pharmaceutical & Chemical Co.*, supra, 810 F.2d 745 ("imposing liability upon only the corporation, but not those corporate officers and employees who actually make corporate decisions, would be inconsistent with Congress' intent to impose liability upon the persons who are involved in the handling and disposal of hazardous substances"); *New York* v. *Shore Realty Corp.*, 759 F.2d 1032, 1052 (2d Cir. 1985) ("a corporate officer who controls corporate conduct and thus is an active individual participant in that conduct is liable for the torts of the corporation"); *United States* v. *Pollution Abatement Services of Oswego, Inc.*, 763 F.2d 133, 135 (2d Cir. 1985), cert. denied sub nom. *Miller* v. *United States*, 474 U.S. 1037, 106 S. Ct. 605, 88 L. Ed. 2d 583 (1985) ("[i]n light of the clear congressional intent to hold 'person[s]' liable for violations, we see no reason to shield from civil liability those corporate officers who are personally involved or directly responsible for statutorily proscribed activity").

Corporate officers also have been held liable personally for violations of the Federal Clean Water Act. See, e.g., *United States* v. *Gulf Park Water Co.*, 972 F. Sup. 1056, 1064 (S.D. Miss. 1997). In *Gulf Park Water Co.*, the court held that an officer's ability to control a facility, plus personal involvement in decisions that result in a violation, are sufficient to impose personal liability under the Federal Clean Water Act. Id. ("[t]he evidence establishes that [the defendants] exercised sufficient actual control over the operations of [the facility] and

had sufficient personal involvement in the decision to discharge effluent into the Mississippi Sound to be individually liable"). The court based its decision on a finding that "[b]oth [officers] had actual hands-on control of the facility's activities, were responsible for on-site management, corresponded with regulatory bodies, and were directly involved in the decisions concerning environmental matters." Id.

State courts have also recognized the liability of responsible corporate officers for resulting pollution. See *T.V. Spano Building* v. *Dept. of Natural Resources*, 628 A.2d 53, 61 (Del. 1993) ("[w]e hold that corporate officers may be held personally liable in appropriate circumstances for actually making corporate decisions resulting in [a violation of the Delaware Hazardous Waste Management Act]"); *Burris* v. *C.J.R. Processing, Inc.*, 269 Ill. App. 3d 1013, 1020, 647 N.E.2d 1035 (1995) ("corporate officers may be held liable for violations of the [Illinois Environmental Protection Act] when their active participation or personal involvement is shown"); *Commissioner, Indiana Dept. of Environmental Management* v. *RLG, Inc.*, 735 N.E.2d 290, 293–99 (Ind. App. 2000) (thorough discussion of application of responsible corporate officer doctrine in recent environmental cases); *State* v. *Standard Tank*, 284 N.J. Super. 381, 403, 665 A.2d 753 (1995) ("[W]e construe the [Water Pollution Control Act] to impose liability only upon corporate officers who are in control of the events that result in the violation. . . . [T]here must be a showing that a corporate officer had actual responsibility for the condition resulting in the violation or was in a position to prevent the occurrence of the violation but failed to do so."); *Wilson* v. *McLeod Oil Co.*, 327 N.C. 491, 518, 398 S.E.2d 586 (1990);[9] *Dept. of Ecology* v.

---

[9] In *Wilson* v. *McLeod Oil Co.*, supra, 327 N.C. 513, the defendant allegedly violated an environmental statute that provided that " '[a]ny person having control over oil . . . which enters the waters of the State . . . shall be strictly liable . . . .' " The defendant argued that he could not be held personally liable as a corporate officer. The court rejected this argument,

*Lundgren*, 94 Wash. App. 236, 243, 245, 971 P.2d 948 (1999) ("If a corporate officer participates in the wrongful conduct, or knowingly approves of the conduct, then the officer . . . is liable for the penalties. . . . As an officer who controlled the corporate conduct, [the defendant] can be deemed an active participant in that conduct.").

The plaintiffs argue that "[t]here is no support in the record, and no finding by the hearing officer, that Irvin or Michael Shiner participated directly in the activities that created actual or potential pollution." We conclude, however, that the record shows that the Shiners had day-to-day decision-making authority over the fuel oil facility, were responsible for its on-site management, and that their decisions caused water pollution at the site. As we observed earlier in this opinion, an omission may form the basis for liability. See *United States* v. *Park*, supra, 421 U.S. 670–71 ("[A]n omission or failure to act [may be] deemed a sufficient basis for a responsible corporate agent's liability. It [is] enough in such cases that, by virtue of the relationship he bore to the corporation, the agent had the power to prevent the act complained of."); *Camacho* v. *1440 Rhode Island Ave. Corp.*, 620 A.2d 242, 247 (D.C. App. 1993) ("[s]ufficient participation can exist where there is an act or omission by the officer which logically leads to the inference that he or she had a share in the wrongful acts of the corporation which constitute the offense"

---

noting that "[a] corporate officer can be held personally liable for torts in which he actively participates"; id., 518; and held that the defendant had "personally participated in the activities surrounding the delivery and sale of gasoline at the . . . property." Id. Specifically, the defendant had "signed the contract which allowed [the installation of] the tanks on the property; he generally oversaw the conducting of business . . . [of] servic[ing] the tanks and equipment and perform[ing] any repairs; and he [had] signed the papers arranging for the deliveries of the gasoline to the property, supervised the account, and was the person contacted about the loss of gasoline from the tanks . . . ." Id.

[internal quotation marks omitted]); *Levi* v. *Schwartz*, 201 Md. 575, 583, 95 A.2d 322 (1953) (officers or agents who consented to act and had actual or apparent authority could be subject to liability).

The record shows that the Shiners had hands-on control over the site and the fuel oil storage there and were responsible for maintaining a condition that already has been, and likely will continue to be, a source of water pollution. Irvin A. Shiner exercised control over the site and directly participated in decisions as to the use, repair and maintenance of an oil storage and distribution facility. He was the president and owner of the controlling stock of BEC, which owned the site until 1995, and he was the president of its predecessors since at least 1970. He was, from 1970 to 1995, present at the site no fewer than five days per week, and he often was present seven days per week. He was aware of all activities at the site, and no major decisions as to the business were made without his approval. Irvin A. Shiner had direct responsibility for environmental compliance, was responsible for coordinating the company's response to oil spills, and had at all times overall control of the operations of the company.

Michael Shiner also exercised hands-on control over the site and directly participated in decisions as to the use, repair and maintenance of the oil storage and distribution facility. As the vice president of BEC, he typically worked at the site five days per week from 1970 to 1995 and was responsible for environmental compliance. In this capacity, he communicated with the environmental agencies including the federal environmental protection agency, the Coast Guard, and the department concerning environmental issues. He also was responsible for spill prevention plans and personally coordinated on-site responses to spill incidents. Additionally, he personally was responsible for spills prevention training at the site.

There was evidence that, after BEC sold its assets to Alliance in 1995, the Shiners, as the only remaining employees of BEC, decided to have the storage tanks inspected by contractors interested in submitting a bid to dismantle them. To do so, Michael Shiner had the tanks' manway covers, which were located about one foot from the floor of the tank farm, removed to allow access. Those tanks contained approximately 7000 gallons of oil sludge and an additional amount of an oil and water mixture. Both of the Shiners knew that the tanks contained this sludge and the oil and water mixture. The tanks were located in a bermed area with an earthen floor through which an intermittent stream ran, requiring that water levels be controlled by the use of a manually operated pump. Michael Shiner knew in April, 1995, that the pump, which drained the accumulated water in the tank farm, must be operated to keep the tanks from filling with water through the manways, but he neither turned the pump on himself nor requested that anyone else do it after the manway covers were removed. Irvin A. Shiner also made no arrangements to ensure that any spring runoffs would not invade the tanks. As a result, through the manways, approximately 20,000 gallons of the oil and water mixture escaped onto the water covered floor of the tank farm and caused staining of the berm's earthen walls, indicating a potential release of pollution into the ground. After this incident, Irvin A. Shiner was at the site helping to coordinate emergency cleanup efforts with the department's oil and chemical spill response division. There has been, however, no investigation or remediation performed by anyone after that spill.

Both Irvin A. Shiner and Michael Shiner were directly responsible for directing the actions of the corporation with respect to the environment and environmental compliance, and they had both the power and the responsibility to initiate preventative and remedial

628

efforts. They had at all times daily, hands-on control of the oil distribution facility at the site. That facility was, without adequate control and maintenance, potentially a source of water pollution from petrochemical spills. Under their management, many thousands of gallons of fuel oil spilled onto the earth floor of the site or directly into the soil from the facility that they were to maintain. Furthermore, aside from emergency spill response activities, no one initiated an investigation to determine what effect the spills would have on the waters abutting their property. Nor was any long-term remediation of any of the spills undertaken at the site. The plaintiffs' management of the facility, and their decisions not to remediate fully the effects of the spills, caused conditions that are creating, and are likely to continue to create, a source of pollution to the waters of the West River and New Haven Harbor. We conclude, therefore, that the commissioner properly determined that Irvin A. Shiner and Michael Shiner have created a condition or are maintaining a facility or condition that reasonably can be expected to create a source of pollution to the waters of the state, and that they were properly ordered by the commissioner to take remedial action. Accordingly, we conclude that the trial court properly dismissed the administrative appeal.

The judgment is affirmed.

In this opinion the other justices concurred.