JAMES VENTRES ET AL. *v.* GOODSPEED
AIRPORT, LLC, ET AL.
(SC 17280)

Sullivan, C. J., and Borden, Norcott, Palmer and Zarella, Js.

106

Argued April 14—officially released August 30, 2005

*John R. Bashaw*, for the appellants-appellees (named defendant et al.).

*Michael J. Donnelly*, for the appellees-appellants (defendant the Nature Conservancy et al.).

*Mark K. Branse*, with whom was *John J. Radshaw III*, for the appellees-appellants (plaintiffs).

*Opinion*

SULLIVAN, C. J. This appeal arises out of a complaint filed by the plaintiffs, the inland wetlands and watercourses commission (commission) of the town of East Haddam (town) and its enforcement officer, James Ventres, against the defendants, Timothy Mellon, Goodspeed Airport, LLC (airport), Timothy Evans, the East Haddam Land Trust (land trust) and the Nature Conservancy (conservancy). The plaintiffs alleged that Mellon, Evans and the airport (collectively, airport defendants) violated the town's inland wetlands regulations by failing to obtain a permit before cutting down trees and other vegetation on two properties owned, respectively, by the land trust and the conservancy (collectively, land trust defendants).[1] The land trust defendants filed a cross claim against the airport defendants claiming, inter alia, that they had: (1) trespassed on their land and converted their trees; (2) violated General Statutes § 22a-16 of the Connecticut Environmental Protection Act;[2] and (3) violated the Connecticut Unfair

[1] The plaintiffs alleged in the second count of the complaint that the airport defendants wilfully had violated the town's inland wetlands regulations. The trial court subsequently dismissed the second count of the complaint and the plaintiffs have not challenged that ruling on appeal.

[2] General Statutes § 22a-16 provides: "The Attorney General, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may maintain an action in the superior court for the judicial district wherein the defendant is located, resides or conducts business, except that where the state is the defendant, such action shall be brought in the judicial district of Hartford, for declaratory and equitable relief against the state, any political subdivision thereof, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction provided no such action shall be maintained against the state for pollution of real property acquired by the state under subsection (e) of section 22a-133m, where the spill or

Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. On the motion of the airport defendants, the trial court struck the CUTPA cross claim. Thereafter, the matter was tried to the court,[3] which rendered judgment for the plaintiffs. With respect to the cross claims, the court concluded that the airport defendants had a prescriptive easement to enter the land in order to trim or cut trees that interfered with air traffic, but that the airport defendants' conduct had unreasonably expanded or intensified the easement. Accordingly, the trial court rendered judgment against the airport defendants on the trespass cross claim. The trial court rendered judgment for the airport defendants on the cross claim for conversion and for the land trust defendants on the cross claim pursuant to § 22a-16. The airport defendants appealed[4] from the trial court's judgment and the plaintiffs and the land trust defendants cross appealed. We affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history. The airport is located on Lumberyard Road in East Haddam. It is an "[a]irport available for public use" within the meaning of title 14 of the Code of Federal Regulations, § 77.2.[5] Mellon is the sole member of Goodspeed Airport, LLC. Evans is an independent contractor who has been the manager of the

discharge which caused the pollution occurred prior to the acquisition of the property by the state."

[3] The case was tried jointly with an action brought by Arthur J. Rocque, the commissioner of environmental protection, against Mellon, the airport, the land trust and the conservancy. The trial court's ruling in that case is the subject of the airport defendants' appeal in the companion case of *Rocque* v. *Mellon*, 275 Conn. 161, 881 A.2d 972 (2005).

[4] The airport defendants appealed to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[5] Title 14 of the Code of Federal Regulations, § 77.2, defines an "[a]irport available for public use" as "an airport that is open to the general public with or without a prior request to use the airport."

airport since November, 2003, and is responsible for managing its day-to-day activities.

The airport's southern boundary lies approximately along the centerline of a tidal creek that flows in a westerly direction into the Connecticut River. That boundary forms the northern boundary of property owned by the land trust, which extends for approximately 335 feet to the south, where it abuts property owned by the conservancy. The conservancy's property extends for another 100 feet to the south, at which point it abuts Chapman Pond. The airport has a 2100 foot runway that runs in a north-south direction. The southern end of the runway is approximately 630 feet north of the airport's southern boundary and 1100 feet north of Chapman Pond.

Between November 29 and December 5, 2000, Evans, at the direction of Mellon and without the permission of the land trust defendants, cut down all of the trees, bushes and woody vegetation on approximately 2.5 acres of land located between the southern boundary of the airport property and Chapman Pond. Approximately 340 trees were destroyed, including some that were 100 years old and seventy-two feet high. The airport defendants claim that the trees and vegetation posed a danger to aircraft landing at and taking off from the runway. The 2.5 acres were entirely within a regulated wetlands area as defined by General Statutes § 22a-38 (15)[6] and were part of a wildlife refuge and nature preserve that extends along the Connecticut River.

Thereafter, the plaintiffs brought this action alleging that the airport defendants had failed to obtain from

[6] General Statutes § 22a-38 (15) defines " '[w]etlands' " as "land, including submerged land, not regulated pursuant to sections 22a-28 to 22a-35, inclusive, which consists of any of the soil types designated as poorly drained, very poorly drained, alluvial, and floodplain by the National Cooperative Soils Survey, as may be amended from time to time, of the Natural Resources Conservation Service of the United States Department of Agriculture . . . ."

the commission a permit to conduct a regulated activity[7] within a wetlands area as required by General Statutes § 22a-42a (c) (1)[8] and the town's inland wetlands regulations.[9] The airport defendants raised numerous special defenses to the plaintiffs' complaint, including a claim that the federal aviation law preempts local wetlands regulations. The land trust defendants brought cross claims against the airport defendants alleging, inter alia, that they had violated CUTPA, trespassed on their land and converted their trees, and that they had caused "unreasonable pollution, impairment or destruction" of a natural resource of the state in violation of § 22a-16 by clear-cutting the trees. Upon the motion of the airport defendants, the trial court struck the CUTPA cross claim. After a trial to the court, the court rejected the airport defendants' special defense of preemption and rendered judgment for the plaintiffs. With respect to the land trust defendants' remaining cross claims, the court found that the airport defendants had a prescriptive easement to enter the land owned by the land trust defendants for the purpose of trimming or cutting trees that interfered with air traffic, but that clear-cutting the trees had unreasonably exceeded and intensified the easement. Accordingly, the court rendered judgment

[7] General Statutes § 22a-38 (13) defines " '[r]egulated activity' " as "any operation within or use of a wetland or watercourse involving removal or deposition of material, or any obstruction, construction, alteration or pollution, of such wetlands or watercourses . . . ."

[8] General Statutes § 22a-42a (c) (1) provides in relevant part: "On and after the effective date of the municipal regulations promulgated pursuant to subsection (b) of this section, no regulated activity shall be conducted upon any inland wetland or watercourse without a permit. Any person proposing to conduct or cause to be conducted a regulated activity upon an inland wetland or watercourse shall file an application with the inland wetlands agency of the town or towns wherein the wetland or watercourse in question is located. . . ."

[9] The town's inland wetlands regulations were prepared in accordance with the Inland Wetlands and Watercourses Act, General Statutes § 22a-28 et seq., and are substantially similar to the statutes that they are intended to implement. For convenience, we refer to the text of the statutes.

for the land trust defendants on their trespass claim and on their claim pursuant to § 22a-16. The court found the airport defendants jointly and severally responsible for paying a civil penalty of $17,500 pursuant to General Statutes § 22a-44 (b)[10] and ordered that they contribute $50,000 to an academic or government funded research project to be identified by the department of environmental protection pursuant to General Statutes § 22a-16a (3).[11] In addition, the court enjoined the airport defendants from "engaging in any regulated activity on the land south of the tidal brook without obtaining a [wetlands] permit" and from entering the land trust defendants' property without their consent, except in a manner consistent with the prescriptive easement. Finally, the court ordered the airport defendants to pay damages in the amount of $1 to the land trust defendants on the trespass claim and to pay attorney's fees to be determined by the court.

---

[10] General Statutes § 22a-44 (b) provides in relevant part: "Any person who commits, takes part in, or assists in any violation of any provision of sections 22a-36 to 22a-45, inclusive, including regulations adopted by the commissioner and ordinances and regulations promulgated by municipalities or districts pursuant to the grant of authority herein contained, shall be assessed a civil penalty of not more than one thousand dollars for each offense. . . ."

[11] General Statutes § 22a-16a provides in relevant part: "In any action brought by the Attorney General under section 22a-16 or under any provision of this title which provides for a civil or criminal penalty for a violation of such provision, the court, in lieu of any other penalties, damages or costs awarded, or in addition to a reduced penalty, damages or costs awarded, may order the defendant (1) to provide for the restoration of any natural resource or the investigation, remediation or mitigation of any environmental pollution on or at any real property which resource or property are unrelated to such action, (2) to provide for any other project approved by the Commissioner of Environmental Protection for the enhancement of environmental protection or conservation of natural resources, (3) to make a financial contribution to an academic or government-funded research project related to environmental protection or conservation of natural resources, or (4) to make a financial contribution to the Special Contaminated Property Remediation and Insurance Fund established under section 22a-133t provided the total aggregate amount of all contributions to said fund under this section shall not exceed one million dollars per fiscal year. . . ."

On appeal, the airport defendants claim that the trial court improperly determined that: (1) federal aviation law does not preempt state and local wetlands regulations; (2) the failure to obtain a wetlands permit can give rise to an independent action under § 22a-16; (3) the removal of vegetation is a regulated activity under § 22a-38 (13); and (4) Mellon is personally liable for cutting the trees. The plaintiffs raise as an alternate ground for affirmance that the airport defendants have not established a factual record on which a claim of preemption can be predicated. They claim on cross appeal that the trial court improperly: (1) failed to order the airport defendants to restore the land to its original condition and imposed monetary penalties that were insufficient to restore it, thereby thwarting the remedial purpose of § 22a-16; and (2) calculated the per diem monetary penalties pursuant to § 22a-44 (b). The land trust defendants claim on cross appeal that the trial court improperly: (1) found a prescriptive easement in favor of the airport; (2) struck their cross claim pursuant to § 42-110a; and (3) determined that they were not entitled under General Statutes § 52-560[12] to damages measured by the cost of replacing the trees and precluded them from introducing evidence of the replacement value.

We conclude that the trial court properly determined that the airport defendants had a prescriptive easement to maintain an approach slope over the land trust defen-

[12] General Statutes § 52-560 provides: "Any person who cuts, destroys or carries away any trees, timber or shrubbery, standing or lying on the land of another or on public land, without license of the owner, and any person who aids therein, shall pay to the party injured five times the reasonable value of any tree intended for sale or use as a Christmas tree and three times the reasonable value of any other tree, timber or shrubbery; but, when the court is satisfied that the defendant was guilty through mistake and believed that the tree, timber or shrubbery was growing on his land, or on the land of the person for whom he cut the tree, timber or shrubbery, it shall render judgment for no more than its reasonable value."

dants' property, but that they exceeded the scope of the easement by clear-cutting the land.[13] We further conclude that, because the airport defendants had no right under state property law to clear-cut the land, they had no such right under federal law and, accordingly, we need not reach their claim that federal law preempts state and local land use law. With respect to the plaintiffs' claims on cross appeal, we conclude that the trial court properly determined that the airport defendants should not be required to restore the land to its original condition and properly determined the amount of monetary penalties pursuant to § 22a-16. We further conclude that the trial court properly determined the per diem monetary penalties pursuant to § 22a-44 (b). With respect to the land trust defendants' claims on cross appeal, we conclude that the trial court properly granted the airport defendants' motion to strike the CUTPA claim. We further conclude that the trial court properly determined that the replacement cost of the trees was not a proper measure of damages pursuant to § 52-560. Accordingly, we affirm the judgment of the trial court.

I

We first address the airport defendants' claim that the trial court improperly determined that federal aviation law does not preempt local wetlands regulations. We conclude that we need not reach this claim because we conclude that the airport defendants had no right under state property law to clear-cut the land belonging to the land trust defendants and because the airport defendants have conceded that, in the absence of a property right, federal law would not confer such a right.

The airport defendants claim that they removed the vegetation from the land trust defendants' properties

---

[13] In this opinion, we use the phrase "clear-cut" to mean cutting close to the ground all trees and vegetation on a given property.

pursuant to federal regulations and guidelines governing the maintenance of unobstructed "runway protection zones"[14] and approach surfaces[15] for airports like the one in the present case. They further argue that the regulations and guidelines are designed to protect navigable airspace,[16] over which the United States has

[14] The Federal Aviation Administration has issued an advisory circular setting forth federal standards and recommendations for airport design. See Federal Aviation Administration, Advisory Circular No. 150/5300-113 (September 29, 1989). The advisory circular states that "[t]he standards and recommendations contained in this advisory circular are recommended by the Federal Aviation Administration for use in the design of civil airports." The circular recommends that airports maintain a "[r]unway protection zone"; id., § 211 (a) (7); from which "incompatible objects and activities" should be cleared. Id., § 212 (a) (1). The purpose of the runway protection zone "is to enhance the protection of people and property on the ground." Id., § 212. For runways like the one in the present case, the circular recommends that the runway protection zone extend 1000 feet beyond the end of the runway and increase in width from 250 feet at the end nearest the runway to 450 feet at the far end. Id., p. 19, table 2-4.

[15] The Federal Aviation Administration has issued regulations establishing "standards for determining obstructions to air navigation" that "apply to the use of navigable airspace by aircraft . . . ." 14 C.F.R. § 77.21 (a). Such obstructions include "existing and proposed manmade objects, objects of natural growth, and terrain." Id. Title 14 of the Code of Federal Regulations, § 77.23, provides that "(a) [a]n existing object . . . is, and a future object would be, an obstruction to air navigation if it is of greater height than any of the following heights or surfaces . . . (5) The surface of a takeoff and landing area of an airport or any imaginary surface established under § 77.25 . . . ." Section 77.25 (d) of title 14 of the Code of Federal Regulations defines the "[a]pproach surface" for the type of airport at issue in the present case as a surface that starts 200 feet from the end of the runway; 14 C.F.R. § 77.25 (c) (primary surface ends 200 feet beyond end of runway); and expands uniformly from a width of 250 feet; 14 C.F.R. § 77.25 (c) (1); to a width of 1250 feet at a horizontal distance of 5000 feet from the beginning of the approach surface. 14 C.F.R. § 77.25 (d) (1) (i); 14 C.F.R. § 77.25 (d) (2) (i). The approach surface also rises at a slope of twenty to one for a horizontal distance of 5000 feet. 14 C.F.R. § 77.25 (d) (2) (i). In the present case, an approach surface with a twenty to one slope would have an elevation of approximately 21.5 feet at the point where the airport property abuts the land trust's property and approximately thirty-eight feet at the point where the land trust's property abuts the conservancy's property.

[16] Section 40102 (a) (30) of title 49 of the United States Code defines " 'navigable airspace' " as "airspace above the minimum altitudes of flight prescribed by regulations under this subpart and subpart III of this part,

exclusive authority, and that, therefore, they preempt state laws that would give state or local authorities the power to prevent the removal of obstructions to air traffic in such areas.[17] The airport defendants appear to argue in their brief that, because the federal government has exclusive jurisdiction over navigable airspace, they could remove obstructions within the navigable airspace without regard to either state property law or state and local land use regulations. At oral argument before this court, however, they clarified that they claim only that they had a right to remove obstructions within the navigable airspace over the land trust defendants' properties because they had acquired a prescriptive right to enter the properties for that purpose under state property law. They conceded that, in the absence of that prescriptive property right, federal law would not confer any such right. See *Westchester* v. *Green-*

including airspace needed to ensure safety in the takeoff and landing of aircraft. . . ."

Title 14 of the Code of Federal Regulations, § 91.119, provides in relevant part: "Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:

"(a) *Anywhere.* An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property on the surface.

"(b) *Over congested areas.* Over any congested area of a city, town, or settlement, or over any open air assembly of persons, an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet of the aircraft.

"(c) *Over other than congested areas.* An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In those cases, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure. . . ."

[17] The airport defendants point to two federal statutes that they claim preempt state and local environmental legislation as applied to their conduct in this case. Section 40103 (a) (1) of title 49 of the United States Code provides: "The United States Government has exclusive sovereignty of airspace of the United States." Section 41713 (b) (1) of title 49 of the United States Code provides in relevant part: "[A] State . . . [or] political subdivision of a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."

*wich*, 745 F. Sup. 951, 955 (S.D.N.Y. 1990) (federal law does not create private cause of action in favor of owner of airport to institute action against neighboring landowner whose trees are encroaching on navigable airspace); see also *Westchester* v. *Greenwich*, 756 F. Sup. 154, 156 (S.D.N.Y. 1991) (owner of airport did not have power of eminent domain or express clearance easement and therefore could interfere with neighboring landowner's ability to grow trees only if it could establish easement by prescription or public nuisance).[18] They claim that they have acquired a prescriptive clearance easement in the land trust defendants' properties under state property law and that federal law preempts any state and local laws that otherwise might limit their easement rights.[19] The land trust defendants counter that the trial court improperly determined that the airport defendants had a prescriptive easement because: (1) the airport defendants failed to meet their burden of establishing the scope of the easement; and (2) the existence of a boundary line agreement between the predecessors in title to the airport and the land trust prevents the airport from obtaining a prescriptive easement pursuant to General Statutes § 47-38.[20] They fur-

---

[18] The *Westchester* case had a long subsequent history and, as we discuss later in this opinion, eventually came before this court. See *Westchester* v. *Greenwich*, 227 Conn. 495, 629 A.2d 1084 (1993). The District Court's conclusions that there is no private cause of action under federal law in favor of an airport owner against neighboring landowners whose trees are encroaching on navigable airspace and that an airport may interfere with a neighboring landowner's ability to grow trees only if it has acquired a property right to do so, however, have never been disturbed.

[19] Neither the trial court nor the parties characterized the easement at issue in the present case as a clearance easement. The trial court concluded, however, that the airport defendants had "acquired a prescriptive easement to go onto the 2.5 acre area, on occasion, and trim or cut trees which interfered with the safety of air traffic taking off or landing on the runway." As we discuss later in this opinion, this is essentially the definition of a clearance easement.

[20] General Statutes § 47-38 provides: "The owner of land over which a right-of-way or other easement is claimed or used may give notice in writing, to the person claiming or using the privilege, of his intention to dispute the

ther argue that, even if the airport defendants had a prescriptive easement, state and local land use law applies to the use of the easement.

We conclude that the trial court properly determined that the airport defendants have acquired a prescriptive easement to enter the land trust defendants' property for the purpose of maintaining an approach slope to the runway. We also conclude that the trial court properly determined that the airport defendants had no right under the prescriptive easement to clear-cut the land trust defendants' property.

We first address the issue of whether the airport defendants have a prescriptive clearance easement in the land trust defendants' properties and, if so, the scope and purpose of the easement. We conclude that the trial court properly determined that the airport defendants have a prescriptive easement to maintain an approach slope over the land trust defendants' property.

The distinction between an avigation easement and a clearance easement was discussed in *United States* v. *Brondum*, 272 F.2d 642 (5th Cir. 1959). An avigation easement "permits free flights over the land in question. It provides not just for flights in the air as a public highway—in that sense no easement would be necessary; it provides for flights that may be so low and so frequent as to amount to a taking of the property." (Internal quotation marks omitted.) Id., 645; see also *Griggs* v. *Allegheny County*, 369 U.S. 84, 88–89, 82 S. Ct. 531, 7 L. Ed. 2d 585 (1962) (definition of navigable airspace in 49 U.S.C. § 40102 [a] [30], formerly 49 U.S.C. § 1301 [24], includes airspace required for airplanes to

right-of-way or other easement and to prevent the other party from acquiring the right; and the notice, being served and recorded as provided in sections 47-39 and 47-40, shall be deemed an interruption of the use and shall prevent the acquiring of a right thereto by the continuance of the use for any length of time thereafter."

land and takeoff safely, but interference with use and enjoyment of neighboring land due to low flights amounts to constitutional taking and entitles landowners to compensation). By contrast, a clearance easement provides the "right to cut trees and natural growth to a prescribed height and to remove man-made obstructions above a prescribed height." *United States* v. *Brondum*, supra, 644. "The interest acquired has but one function . . . and that is to serve as the ceiling over the land in question beyond which obstructions or structures may not be allowed to extend upward into the adjacent air space." (Internal quotation marks omitted.) Id., 644–45 n.5; see also *Melillo* v. *New Haven*, 249 Conn. 138, 143 n.11, 732 A.2d 133 (1999).

The status of both prescriptive avigation easements and prescriptive clearance easements is unsettled under Connecticut law. See *Westchester* v. *Commissioner of Transportation*, 9 F.3d 242, 245 (2d Cir. 1993), cert. denied, 511 U.S. 1107, 114 S. Ct. 2102, 128 L. Ed. 2d 664 (1994). In *Westchester* v. *Greenwich*, 227 Conn. 495, 498–500, 629 A.2d 1084 (1993), the plaintiff, a New York municipal corporation that owned and operated the Westchester County Airport, had initiated an action in the United States District Court for the Southern District of New York against the defendants, the town of Greenwich and several residents of the town, claiming a prescriptive avigation easement in the airspace over the defendants' properties and seeking an injunction against the defendants authorizing the plaintiff to trim or cut down trees on the properties that had penetrated the airport's flight zone. The United States Court of Appeals for the Second Circuit certified the following questions to this court: "1. Can an avigation easement be acquired by prescription in the State of Connecticut?

"2. If under Connecticut law a clearance easement is distinct from an avigation easement, can a clearance

easement be acquired by prescription in the State of Connecticut?

"3. Whether conceived as incident to an avigation easement or as constituting a separate clearance easement, would a clear zone include whatever air space is necessary to use the easement?" (Internal quotation marks omitted.) Id., 497 n.2. Because we concluded that, under the facts and circumstances of the case, the plaintiff could not establish a prescriptive avigation easement, we declined to answer the certified questions. Id., 502, 504.

In making that determination, we recognized that, in order to establish a prescriptive avigation or clearance easement, the party claiming the easement must meet the requirements of state law that "the use be adverse. It must be such as to give a right of action in favor of the party against whom it has been exercised. . . . In order to prove such adverse use, the party claiming to have acquired an easement by prescription must demonstrate that the use of the property has been open, visible, continuous and uninterrupted for fifteen years and made under a claim of right." (Citation omitted; internal quotation marks omitted.) Id., 501. "A use by express or implied permission or license cannot ripen into an easement by prescription." (Internal quotation marks omitted.) Id. We concluded that the plaintiff could not establish that its use of the airspace gave a right of action in favor of the defendants, thereby giving rise to a prescriptive easement, because: (1) "[t]he defendants . . . had no right of action against the plaintiff to stop the overflights because federal law prohibits landowners from obtaining injunctive relief against aircraft using the navigable airspace of the United States"; id., 502; and (2) although the defendants had a right "to seek compensation from the plaintiff for aircraft flights so low and so frequent as to be a direct and immediate interference with the enjoyment

and use of the land"; (internal quotation marks omitted) id., 503; there was no evidence of such interference in the case. Id., 504.

In the present case, unlike in *Westchester* v. *Greenwich*, supra, 227 Conn. 495, it is clear that the conduct that the airport defendants claim gave rise to a prescriptive clearance easement constituted a "direct and immediate interference with the [land trust defendants'] enjoyment and use of the land" entitling them to seek compensation; (internal quotation marks omitted) id., 503; and, therefore, the use was adverse. Cf. id., 504 (plaintiff could not establish that it had prescriptive easement because it failed to establish that overflights had harmed defendants' trees); see also *Drennen* v. *Ventura*, 38 Cal. App. 3d 84, 86–87 n.2, 112 Cal. Rptr. 907 (1974) (that which may be acquired by exercise of power of eminent domain should be subject to acquisition by prescription). Accordingly, we conclude that the airport defendants' use of the land trust defendants' properties could give rise to a prescriptive clearance easement if the other requirements for a prescriptive easement are met.

There is no dispute in this case that the airport defendants' use of the land trust defendants' property was "open, visible, continuous and uninterrupted for fifteen years and made under a claim of right." (Internal quotation marks omitted.) *Westchester* v. *Greenwich*, supra, 227 Conn. 501. The land trust defendants claim, however, that the trial court improperly found that the airport defendants had a prescriptive easement because: (1) the airport defendants failed to meet their burden of establishing the scope of the easement; and (2) the existence of a boundary line agreement prevented the airport defendants from acquiring a prescriptive easement. We address each of those claims in turn.

## A

The following additional facts are relevant to the resolution of the land trust defendants' claim that the airport defendants failed to meet their burden of establishing the scope of the easement. Arthur D'Onofrio, a previous owner of the airport, testified at trial that, between 1979 and 1999, trees located within the 2.5 acres at issue in the present case were periodically trimmed or removed. The cuttings took place approximately every four or five years. The trees usually were trimmed or removed in response to complaints from pilots that the trees were protruding into the airspace and becoming a safety hazard. D'Onofrio testified that the procedure for trimming the trees was not "very scientific. Basically, [he] sent people in there with chainsaws and they cut down whatever . . . trees they thought were in the way of the approach." Shrubs were also removed in order to provide access to the trees. The cutting area was approximately 100 to 150 feet wide and was centered on the center line of the runway. Landing area inspection reports showed that, in 1981, the runway operated with a fourteen to one approach slope;[21] in 1983, it operated with a thirteen to one approach slope; in 1984 and 1985, it operated with a nineteen to one approach slope with a displaced threshold of 340 feet;[22] in 1986, it operated with a twenty to one slope with a displaced threshold of 340 feet; in 1987 and 1988, it operated with a twenty to one slope with a displaced threshold of 150 feet; in 1993, it operated

---

[21] In other words, for every fourteen feet that the approach slope advanced horizontally, it rose one vertical foot.

[22] When an approach slope is steeper than the twenty to one ratio required by Federal Aviation Administration regulations; see footnote 15 of this opinion; the permissible landing point is shifted from the end of the runway to a point where the twenty to one approach slope is achieved. This point is known as a "displaced threshold." In such cases, the approach slope is calculated with reference to the displaced threshold.

with a fourteen to one approach slope; and in 1997, it operated with a thirteen to one approach slope.

On the basis of this evidence, the trial court determined that the airport defendants had acquired a prescriptive easement to enter the land trust defendants' property to trim and cut trees growing in the 2.5 acres at issue for the purpose of removing obstacles in the runway takeoff and landing corridors. After the trial court issued its memorandum of decision, the land trust defendants filed a motion for articulation requesting that the trial court provide the precise boundaries of the easement. The trial court denied the motion, stating that "[t]he memorandum of decision specified the extent of the prescriptive easement as particularly as possible under the circumstances of this case."

The land trust defendants claim that the trial court improperly found that the airport defendants had established a prescriptive easement because the easement "must be defined in terms of height, in addition to the more traditional length and width of a pathway" and because the evidence showed that "there has been no uninterrupted fifteen year period in which the airport maintained anything resembling a consistent glide path." We disagree.

"[A] prescriptive right extends only to the portion of the servient estate actually used . . . and is circumscribed by the manner of its use . . . . A prescriptive right cannot be acquired unless the use defines its bounds with reasonable certainty." (Citations omitted.) *Kaiko* v. *Dolinger,* 184 Conn. 509, 510–11, 440 A.2d 198 (1981); see also *Schulz* v. *Syvertsen,* 219 Conn. 81, 92, 591 A.2d 804 (1991). The boundaries of a prescriptive easement need not be described by metes and bounds if the character of the land makes such precise description impossible. *McCullough* v. *Waterfront Park Assn.,*

*Inc.*, 32 Conn. App. 746, 759, 630 A.2d 1372, cert. denied, 227 Conn. 933, 632 A.2d 707 (1993).[23]

The burden is on the party claiming a prescriptive easement to prove all of the elements by a preponderance of the evidence. *Schulz* v. *Syvertsen*, supra, 219 Conn. 91. "Whether the requirements for such a right have been met in a particular case presents a question of fact for the trier of facts. . . . In such cases, the trier's determination of fact will be disturbed only in the clearest of circumstances, where its conclusion could not reasonably be reached." (Citations omitted; internal quotation marks omitted.) *Robert S. Weiss & Co.* v. *Mullins*, 196 Conn. 614, 618–19, 495 A.2d 1006 (1985).

The only issue in the present case is whether the vertical dimensions of the prescriptive easement claimed by the airport defendants were sufficiently defined. During the years that the approach slope was measured without a displaced threshold, it ranged from thirteen to one to fourteen to one. During the years

---

[23] See also *O'Brien* v. *Hamilton*, 15 Mass. App. 960, 962, 446 N.E.2d 730 (extent of easement gained by prescription for successive owners of dominant land must be measured by general pattern formed by adverse use), appeal denied, 389 Mass. 1102, 448 N.E.2d 767 (1983); *Alvin* v. *Johnson*, 245 Minn. 322, 323 n.2, 71 N.W.2d 667 (1955) (court's description of prescriptive easement as " 'width for reasonable use' " was not "so devoid of description as to be totally unenforceable"); *Silverstein* v. *Byers*, 114 N.M. 745, 749, 845 P.2d 839 (1992) (one-quarter mile deviation in route of roadway did not defeat claim to prescriptive easement, especially when divergence was not voluntary act of person claiming right but was due to circumstances beyond his control), cert. denied, 115 N.M. 60, 846 P.2d 1069 (1993); *Concerned Citizens* v. *Holden Beach Enterprises, Inc.*, 329 N.C. 37, 47, 404 S.E.2d 677 (1991) (deviations in line of travel do not necessarily preclude finding of substantial identity of prescriptive easement if character of land prevents confinement of path to definite and specific line); *Community Feed Store, Inc.* v. *Northeastern Culvert Corp.*, 151 Vt. 152, 157, 559 A.2d 1068 (1989) ("the use under which a prescriptive easement arises determines the *general outlines* rather than the minute details of the interest" [emphasis in original; internal quotation marks omitted]), quoting 5 Restatement, Property § 477, comment b, (1944).

that the approach slope was measured with reference to a displaced threshold of 340 feet, it ranged from nineteen to one to twenty to one. Our calculations show that these slopes are relatively consistent with the thirteen to one and fourteen to one approach slopes measured with reference to the end of the runway.[24]

In light of the type of use at issue, we conclude that the variations in the angle of the approach slope maintained by the airport defendants did not prevent them from acquiring a prescriptive easement. First, trees grow. It is clear, therefore, that it would be virtually impossible to maintain an absolutely uniform slope over the course of time. Second, a very localized and relatively small change in the topography of the vegetation could cause a major change in the approach slope. For example, a sudden growth spurt in a single tree near the border between the land trust and airport properties could cause the approach slope to become much steeper in a short period of time. Third, although the angle of the approach slope changed from year to year, it appears to have stayed within a relatively narrow range centering around twenty to one with a 340 foot displaced threshold. See footnote 24 of this opinion.

---

[24] If a 340 foot displaced threshold is used and a uniform slope of vegetation and the absence of obstacles south of the conservancy's property are assumed, a 14 to 1 approach slope becomes approximately an 18 to 1 approach slope (the distance from the end of the runway to Chapman Pond, 1100 feet, divided by 14 is 78.57 feet, the presumptive height of the approach slope at Chapman Pond; the distance from the displaced threshold to Chapman Pond, 1440 feet, divided by 78.57 is approximately 18); using the same form of calculation, a 13 to 1 approach slope becomes approximately a 17 to 1 approach slope; and a 20 to 1 approach slope with a 150 foot displaced threshold becomes approximately a 23 to 1 approach slope. Thus, over the course of 18 years, the approach slope ranged from approximately 17 to 1 with a 340 foot displaced threshold to 23 to 1 with a 340 foot displaced threshold. We recognize that this calculation is somewhat rough. It is reasonable to conclude, however, that, because the runway had an approach slope ranging from 14 to 1 to 13 to 1 both before and after the 10 years in which the approach slope was calculated in reference to a displaced threshold, the approach slope during those 10 years was not radically different.

Finally, although D'Onofrio testified that he would both trim and cut down trees that protruded into the airspace, the *purpose* of the easement was to *maintain a maximum tree height* over the land, not to eliminate the trees altogether, and that was the actual result of the airport defendants' use of the property. See *United States* v. *Brondum*, supra, 272 F.2d 644–45 n.5. Accordingly, we conclude that the cutting of a tree when the trimming of the tree would have been sufficient to maintain the ceiling was a deviation from the easement and neither destroyed it nor created a prescriptive right to cut trees to the ground when trimming them would suffice. See footnote 23 of this opinion; cf. *Kuras* v. *Kope*, 205 Conn. 332, 341, 533 A.2d 1202 (1987) ("[t]he use of an easement must be reasonable and as little burdensome to the servient estate as the nature of the easement and the purpose will permit" [internal quotation marks omitted]). In summary, we conclude that the trial court's determination that the dimensions of the easement were defined with sufficient certainty to be enforceable was not clearly erroneous, given the nature of the claimed prescriptive easement.

B

We next address the land trust defendants' claims that the trial court improperly determined that the airport defendants had acquired a prescriptive easement in their properties because the existence of a boundary line agreement between the predecessors in title to the airport and the land trust prevented the airport from obtaining a prescriptive easement pursuant to § 47-38.[25] We disagree.

---

[25] The land trust defendants also point to a letter dated June 7, 1978, from the airport operator at the time to the Connecticut bureau of aeronautics. The operator stated that he was in the process of obtaining permission to remove or trim trees on the land to the south of the airport property in order to reduce the approach slope. The land trust defendants argue that this letter defeats any claim that the airport defendants trimmed and removed trees from their property under a claim of right, but they point to no evidence

The following additional facts are relevant to our resolution of this claim. On December 3, 1970, Edward Vynalek and Dorothy Vynalek (collectively, the Vynaleks), predecessor landowners to the land trust, and William H. Bradway and Ruth E. Bradway (collectively, the Bradways), predecessor landowners to the airport, entered into a boundary line agreement. The purpose of the agreement was to resolve a dispute over the location of the boundary between their properties by making the boundary the center of the tidal creek. The agreement provided that "the said BRADWAYS do hereby remise, release, and forever QUIT-CLAIM unto the said VYNALEKS, their heirs and assigns forever, all the right, title, interest, claim and demand whatsoever as the said BRADWAYS have or ought to have in or to the lands situated generally south of said division line between the lands of the parties herein TO HAVE AND TO HOLD the said premises unto the said VYNALEKS, their heirs and assigns forever, so that the said BRAD-WAYS, their heirs nor any other person shall hereafter have any claim, right or title in or to the said premises, or any part thereof and they are by these presents forever barred and excluded therefrom." The trial court concluded that the agreement did not prevent the airport defendants from acquiring a prescriptive easement in the land trust's property because, although "entering the [land trust defendants'] land may contravene the rights to exclusive possession conveyed by the boundary agreement, every prescriptive easement is similarly acquired."

The land trust defendants argue that the trial court improperly failed to recognize that the agreement constituted notice, under § 47-38, of the land trust's intention to prevent the airport defendants from acquiring a prescriptive easement. In support of this argument,

---

that the airport or its predecessors actually obtained permission to enter the land. Accordingly, we reject this claim.

they rely primarily on this court's decision in *Crandall* v. *Gould*, 244 Conn. 583, 711 A.2d 682 (1998). In that case, "[t]he plaintiffs . . . [owned] property located at 283 River Road in the town of Stonington. The defendants . . . [owned] property, including a [private way], that [abutted] the property owned by the plaintiffs.

"A fence was constructed along the [private way] in 1960. In 1960 . . . the defendants' [predecessor] in title, obtained a permanent injunction . . . against . . . a plaintiff in [the] action, enjoining him, his servants and agents from interfering with [the predecessor's] use and enjoyment of said right-of-way . . . ." (Internal quotation marks omitted.) Id., 585–86.

"In 1964, the plaintiffs removed a section of the fence. The plaintiffs used the front portion of the [private way] to the opening of the fence as a means of gaining vehicular access to their property from River Road." (Internal quotation marks omitted.) Id., 586. Thereafter, the plaintiffs commenced an action seeking to enjoin the defendants from interfering with their use of the private way. Id. The trial court concluded that, because the plaintiffs had been permanently enjoined from using the private way, they did not have a claim of right to use it and, therefore, could not establish an easement by prescription. Id., 585–86.

On appeal, this court agreed with the trial court that the plaintiffs had violated the permanent injunction issued by the trial court in 1960 by using the private way. Id., 589. We further concluded that, although the plaintiffs' use of the private way was not permissive and was made without any recognition of the defendants' rights to prevent it and, therefore, ordinarily would have established that the plaintiffs had acted under a claim of right, the existence of the permanent injunction precluded the plaintiffs from acquiring a prescriptive easement. Id., 591–93. In support of this con-

clusion, we stated that, under § 47-38, when formal notice of intent to prevent another party from acquiring an easement has been provided, no such easement may be acquired. Id., 593–94. We further stated that "a party that obtains a permanent injunction [against a particular use] necessarily will have served notice on the opposing party that will very nearly conform to the requirements of § 47-38 and, in fact, may be superior to that contemplated by § 47-38 . . . ." Id., 594.

We conclude that the present case is distinguishable from *Crandall*. In *Crandall*, the injunction issued by the trial court in 1960 had been sought and was issued for the express purpose of prohibiting the plaintiffs from using the private way as an easement. In the present case, the purpose of the boundary line agreement was to resolve a property line dispute. The language of the agreement providing that neither the "BRADWAYS, their heirs nor any other person shall hereafter have any claim, right or title in or to the [Vynaleks'] premises, or any part thereof and they are by these presents forever barred and excluded therefrom" was intended merely to recognize that the Bradways had agreed to disavow any property interest in any formerly disputed land on the Vynaleks' side of the newly agreed upon property line and that their successors would have no such interest by virtue of anything that had occurred up to the date of the agreement. Nothing in the agreement suggests that the Vynaleks were aware of any past use or anticipated any future use, for any purpose, of the portion of their land that had not been in dispute or that they intended to forestall the acquisition of a prescriptive easement in the land. We conclude, therefore, that the trial court properly determined that the boundary line agreement did not constitute notice of intent to prevent the airport defendants from acquiring an easement under § 47-38 and, therefore, did not prevent

the airport defendants from acquiring a prescriptive easement in the land trust defendants' properties.

## C

We next turn our attention to the trial court's determination that the airport defendants exceeded the scope of the prescriptive easement by clear-cutting the land trust defendants' properties. We note that the airport defendants do not challenge that determination on appeal.[26] Rather, their position appears to be that once they have established *any* property right in the land trust defendants' lands, no matter how limited, federal law preempts *all* of the landowners' residual property rights and *all* state and local land use laws limiting

[26] As we have indicated, the vertical dimensions of the easement varied within a relatively narrow range centered around a twenty to one slope with a 340 foot displaced threshold. As we have also indicated, when the airport defendants clear-cut the land, some of the trees within the easement were up to seventy-two feet high. It is clear, therefore, that it was not reasonably necessary to clear-cut the trees to maintain an approach slope within the specified ranges. See *Gioielli* v. *Mallard Cove Condominium Assn., Inc.*, 37 Conn. App. 822, 831–32, 658 A.2d 134 (1995) ("[W]hen an easement is established by prescription, the common and ordinary use which establishes the right also limits and qualifies it. . . . The use of an easement must be reasonable and as little burdensome to the servient estate as the nature of the easement and the purpose will permit."); see also *Zhang* v. *Omnipoint Communications Enterprises, Inc.*, 272 Conn. 627, 637, 866 A.2d 588 (2005) ("[s]ubject to the proviso that the servitude beneficiary is not entitled to cause unreasonable damages to the servient estate, or interfere unreasonably with its enjoyment . . . the beneficiary of an easement [may] make any use of the servient estate that is reasonably necessary for the convenient enjoyment of the servitude for its intended purpose"). Moreover, if the clear-cutting had occurred during the prescriptive period, it presumably would have provoked the same reaction from the land trust defendants as it did in the present circumstances. See *McCullough* v. *Waterfront Park Assn., Inc.*, supra, 32 Conn. App. 756 ("[a]n unreasonable increase in burden is such a one as it is reasonable to assume would have provoked the owner of the land being used to interrupt the use had the increase occurred during the prescriptive period"). Accordingly, even if the airport defendants had challenged the trial court's determination that the clear-cutting exceeded the scope of the prescriptive easement, we would conclude that that determination was not clearly erroneous.

those rights. As we have indicated, however, the airport defendants conceded at oral argument before this court that, in the absence of any state law property right to enter the land trust defendants' properties for the purpose of trimming and cutting trees, federal law would confer no such right. We cannot perceive why, if federal law would confer *no* right to enter the land trust defendants' properties in the absence of a property right to do so, federal law would trump *all* residual private property rights of the landowner and state as well as state and local land use laws where the airport defendants established only a *limited* property right. If the airport defendants had no cause of action against the land trust defendants to require them to clear-cut the land under federal law; see *Westchester* v. *Greenwich,* supra, 745 F. Sup. 955; they had no right under federal law to conduct such an activity themselves. Accordingly, we conclude that, under the airport defendants' own reasoning, they had no right under federal law to clear-cut the trees in the absence of a right to do so under state property law.[27] In light of the trial court's unchallenged determination that the airport defendants had no such property right, we conclude that we need not address their claim that, if they had such a right,

---

[27] It seems somewhat counterintuitive that federal aviation law might preempt state and local law governing the use of real property even though it does not preempt state property law. There is some precedent for that proposition, however. See *National Aviation* v. *Hayward,* 418 F. Sup. 417, 424–25 (N.D. Cal. 1976) (exercise of municipal police power to regulate aircraft noise is preempted by federal law but right of municipal proprietor of airport to determine permissible noise level is not preempted). It is implicit in *National Aviation* that, although neighboring landowners could seek compensation if airport noise interfered with the use and enjoyment of their property, if a municipal airport proprietor obtained noise easements from the landowners, state and local governments could not regulate noise levels. See id., 421. As we have indicated, however, we need not consider in the present case the extent to which the principles cited in *National Aviation* apply to privately owned airports and prescriptive clearance easements because the airport defendants have not established that they have a property right to clear-cut the land trust defendants' trees.

federal law would preempt the application of local land use law.[28] We conclude, therefore, that in the absence of any right under state property law to clear-cut the trees, state and local laws regulating activity within wetlands and watercourses applied to the airport defendants' conduct.

## II

We next address the airport defendants' claim that, even if we conclude that federal law did not preempt the application of state and local wetlands regulations to their conduct, the trial court improperly rendered judgment for the land trust defendants on their cross claim that cutting the trees constituted unreasonable pollution under § 22a-16 because the claim was predicated on the airport defendants' failure to obtain a permit pursuant to the Inland Wetlands and Watercourses Act (act), General Statutes § 22a-28 et seq., and, therefore, could not form the basis for a claim under § 22a-16. We disagree.

The following additional procedural history is relevant to our resolution of this claim. In the sixth count of their cross claim against the airport defendants, the land trust defendants claimed that the clear-cutting of their land had "removed a natural buffer that existed between Chapman Pond and any [a]irport disturbances, threaten[ed] the integrity of Chapman Pond and the lower Connecticut River Watershed, and involve[d] conduct which has, or is reasonably likely to have, the effect

[28] We note that the plaintiffs do not claim that the type of activities allowed by the prescriptive easement would violate state or local land use regulations. Accordingly, we need not consider whether federal law would preempt local regulations with respect to those activities. Nor need we consider the plaintiffs' alternate ground for affirmance that, in the absence of any factual foundation that the airport defendants had initiated proceedings with the Federal Aviation Administration to identify and eliminate obstructions on the land trust defendants' property, there was no factual predicate for the airport defendants' claim of preemption.

of unreasonably polluting, impairing or destroying the public trust in Chapman Pond by increasing noise pollution and other destruction and impairment of wetlands, watercourses and other environmentally sensitive habitats in breach of the public trust. For example, the stream that these trees helped to shade and retain has a documented population of wild brook trout and the removal of the shade trees will adversely affect the stream water quality, temperature, and habitat. The trees also served to buffer Chapman Pond's breeding waterfowl and wintering bald eagle habitat from the airport." (Internal quotation marks omitted.)

The trial court found that the "clear-cutting was unreasonable under all of the circumstances. In the past, only trimming and selective cutting of trees was employed to remove such obstacles to air navigation, which the growing trees created. There existed no sound reason to abandon that conservative practice. To sever every tree and woody-stemmed bush, regardless of height and species, destroyed important floodplain forest excessively and unnecessarily." Accordingly, the court rendered judgment for the land trust defendants on the sixth count of their cross claim.

The airport defendants argue that the sixth count of the land trust defendants' cross claim was duplicative of the first count of the commissioner of environmental protection's complaint in the companion case of *Rocque* v. *Mellon*, 275 Conn. 161, 167–69, 881 A.2d 972 (2005), in which the commissioner alleged that the airport defendants had violated § 22a-16 by failing to obtain a permit as required by § 22a-42a (c) (1). See footnote 3 of this opinion. The trial court concluded in that case that the commissioner could not prevail on its claim because, under this court's decision in *Connecticut Coalition Against Millstone* v. *Rocque*, 267 Conn. 116, 138–48, 836 A.2d 414 (2003), "the failure to obtain a license or permit to engage in conduct which impinges

on the environment cannot form the basis for a . . . claim under § 22a-16." The airport defendants argue that, in the present case, the trial court should have dismissed the land trust defendants' claim under § 22a-16 for the same reason. We note that, in the companion case, we reversed the trial court's dismissal of the first count of the commissioner's complaint and remanded the case with direction to render judgment in favor of the commissioner on that count. *Rocque* v. *Mellon*, supra, 169–70. For similar reasons, we conclude in the present case that the trial court properly rendered judgment for the land trust defendants on the sixth count of their complaint.

Because the airport defendants' claim implicates the standing of the land trust defendants to raise a claim under § 22a-16, it necessarily implicates the trial court's subject matter jurisdiction over the claim. See *Connecticut Coalition Against Millstone* v. *Rocque*, supra, 267 Conn. 127–28. "A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) Id.

In *Connecticut Coalition Against Millstone* v. *Rocque*, supra, 267 Conn. 116–18, 134, the plaintiffs, environmental activists, claimed that the Millstone Nuclear Power Generating Station should be enjoined from operating because it was functioning under an improperly issued permit. We determined that "[a]llegations of improper decisions by the commissioner for failure to comply with the statutory requirements regarding permit renewal proceedings and emergency authorizations cannot be construed as anything other than a licensing claim under [General Statutes] § 22a-430." Id., 134. Relying on a long series of cases in which

we had held that § 22a-16 does not confer standing to litigate decisions regarding permits that are within the exclusive jurisdiction of a state agency, we concluded that the trial court properly had dismissed the plaintiffs' claims. Id., 129–38. In doing so, we distinguished other cases in which we had determined that the plaintiffs had standing under § 22a-16 because, although the lack of an appropriate permit had been alleged, the plaintiffs had raised independent "claims of unreasonable pollution [that] were directed primarily to the polluting activity itself, and not . . . to the validity of an existing permit or authorization . . . ." Id., 139–40, citing *Keeney* v. *Old Saybrook*, 237 Conn. 135, 140–41, 676 A.2d 795 (1996) (alleging unreasonable pollution of state waters from town's failure to comply with pollution abatement orders); *Commissioner of Environmental Protection* v. *Connecticut Building Wrecking Co.*, 227 Conn. 175, 190, 629 A.2d 1116 (1993) (alleging unreasonable pollution from failure to obtain permit for operation of solid waste facility that generated leachate, which degraded groundwater); *Keeney* v. *L & S Construction*, 226 Conn. 205, 209, 626 A.2d 1299 (1993) (alleging unreasonable pollution from depositing construction debris in close proximity to area water supply without permit).

In the present case, unlike in *Connecticut Coalition Against Millstone* v. *Rocque*, supra, 267 Conn. 139, the land trust defendants make no claim that the clearcutting of their properties constituted unreasonable pollution because the airport defendants had failed to obtain a wetlands permit. Indeed, their cross claim makes no reference to the need for a permit at all.[29]

---

[29] We conclude elsewhere in this opinion that the clear-cutting constituted a regulated activity for which a permit was required. See part III of this opinion. In *Waterbury* v. *Washington*, 260 Conn. 506, 557, 800 A.2d 1102 (2002), we held that "when there is an environmental legislative and regulatory scheme in place that specifically governs the conduct that the plaintiff claims constitutes an unreasonable impairment under [§ 22a-16], whether the conduct is unreasonable under [§ 22a-16] will depend on whether it

Instead, their claim was "directed primarily to the polluting activity itself . . . ." Accordingly, we conclude that the trial court properly rejected the airport defendants' claim that the land trust defendants lacked standing to raise this cross claim.

### III

We next address the airport defendants' claim that the trial court improperly rendered judgment for the plaintiffs on their claim that the airport defendants violated the act by failing to obtain a permit to clear-cut the land trust defendants' properties. They argue that the removal of vegetation from the properties was not a regulated activity under the act because it did not disturb any wetlands soils. We disagree.

The trial court found that "[t]he floodplain forest which was clear-cut comprised diverse species of hardwood trees and woody shrubs. . . . [A]round 340 trees and tree sprouts were severed on land trust property and a few more on conservancy land. These trees acted as a flood brake, slowing the velocity of the occasional floodwaters of the Connecticut River which regularly spill into the floodplains and eventually into Chapman's Pond. The slower the flow of floodwater, the less erosion, scouring, and damage to the submerged land and water bodies is done. The taller and denser the floodplain forest, the greater the buffering capacity to slow floodwaters. Undoubtedly, the felling of all trees and

complies with that scheme." We need not consider, however, whether the plaintiffs would have issued a wetlands permit for clear-cutting the land if an application for a permit had been submitted because we have concluded in part I of this opinion that the airport defendants had no rights in the property that would have entitled them to submit such an application. In the absence of any such right, the airport defendants' conduct necessarily would not have been permitted. Accordingly, we conclude that the trial court properly determined that "[t]o sever every tree and woody-stemmed bush, regardless of height and species, destroyed important floodplain forest excessively and unnecessarily," and was, therefore, unreasonable.

woody vegetation over 2.5 acres in the midst of a flood-plain corridor between the Connecticut River and Chapman's Pond altered that wetlands and the abutting floodplains and wetlands." Accordingly, the trial court concluded that the airport defendants had violated § 22a-42a (c) (1) of the act and were liable for damages of $17,500 under § 22a-44 (b).

We first address the standard of review. "Whether the trial court properly concluded that the commission had jurisdiction over the activities proposed by the plaintiff involves a legal question involving statutory interpretation, over which our review is plenary." *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission*, 266 Conn. 150, 158, 832 A.2d 1 (2003).

We begin with the language of the statute. General Statutes § 22a-38 (13) defines " '[r]egulated activity' " as "any operation within or use of a wetland or watercourse involving removal or deposition of material, or any obstruction, construction, alteration or pollution, of such wetlands or watercourses . . . ." Thus, the definition expressly includes operations "involving removal or deposition of material" in wetlands areas. In the present case, the airport defendants removed the living vegetation canopy growing over the wetlands and deposited the woody remains on the ground.[30] If the removal of all vegetation growing in a wetlands area was not intended to be a regulated activity, we would be hard pressed to imagine what type of material the legislature had in mind in enacting § 22a-38 (13).

[30] Brian Golembiewski, an environmental analyst with the inland water resources division of the bureau of water management and the department of environmental protection, appeared at trial as the plaintiffs' expert witness. He testified that, "[u]nfortunately, all of this woody material has been left in place, so even . . . where you would have sunlight and you'd have . . . herbaceous or soft-stemmed short plants that would now have sunlight that they didn't have prior . . . [that] could grow and establish, that would even be somewhat limited by this blanket of woody materials left out there."

Accordingly, we conclude that the clear-cutting was a regulated activity.

The airport defendants argue, however, that our opinion in *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission*, supra, 266 Conn. 150, supports their claim that the clear-cutting of the land trust defendants' land was not a regulated activity. In that case, the plaintiff appealed to the trial court after the defendant inland wetlands commission had denied its application for an inland wetlands permit. Id., 152. The trial court dismissed the appeal and the plaintiff appealed to this court, claiming that the denial was improper because its proposed construction activities would not take place within any wetlands, watercourses or wetlands buffer area. Id. The defendant argued that the act was intended not only to protect the wetlands from physical damage or intrusion, but to protect wildlife and biodiversity both within and outside the borders of the wetlands. Id., 156–57. We noted that § 22a-38 (15) defined wetlands as "*land*, including submerged land . . . which consists of any of the *soil types* designated as poorly drained, very poorly drained, alluvial, and floodplain . . . ." (Emphasis in original; internal quotation marks omitted.) Id., 162. We determined that, although an "inland wetlands commission may regulate activities taking place outside the wetlands boundaries and upland review [buffer] areas if such activities are likely to have an impact or effect on the wetlands themselves"; id., 161; "the act protects [only] the physical characteristics of wetlands and watercourses and not the wildlife, including wetland obligate species, or biodiversity." Id., 163. Accordingly, we concluded that the plaintiff's proposed construction activities did not require the issuance of a regulated activity permit.[31] Id., 171.

[31] The legislature responded to our ruling in *AvalonBay Communities, Inc.*, by enacting No. 04-209 of the 2004 Public Acts, now codified at General Statutes § 22a-41 (c), which provides: "For purposes of this section, (1) 'wetlands or watercourses' includes aquatic, plant or animal life and habitats in wetlands or watercourses, and (2) 'habitats' means areas or environments

We conclude that the airport defendants read *Ava-lonBay Communities, Inc.*, too broadly when they argue that activities that affect the vegetation growing *within* a wetlands but that do not disturb the soil cannot be regulated. Nothing in that case suggests that the act's definition of the term wetlands was intended to exclude vegetation growing within the wetlands, and we perceive no reason to conclude in the present case that the legislature had any such intention. In ordinary usage, the word "land" includes things growing on the land. See Black's Law Dictionary (4th Ed. Rev. 1968) ("'[l]and' includes not only the soil or earth, but also things of a permanent nature affixed thereto or found therein, [including] water, trees, grass, herbage, other natural or perennial products, growing crops or trees [and] mineral under the surface"). In any event, the trial court expressly concluded that the airport defendants' activities would result in damage to the soils themselves as a result of increased "erosion [and] scouring . . . [of] the submerged land and water bodies . . . ." That factual finding was supported by the court's finding that the land was in a floodplain and that a taller and denser vegetation cover would prevent such damage by slowing floodwaters.[32] Accordingly, we reject this claim and affirm the trial court's determination that the clear-cutting was a regulated activity.

## IV

We next address the airport defendants' claim that the trial court improperly determined that Mellon was

in which an organism or biological population normally lives or occurs." The plaintiffs argue that this amendment is retroactive because it was intended to clarify that clear-cutting of vegetation within a wetlands is a regulated activity. We need not reach this claim because we conclude that the airport defendants' conduct was a regulated activity under the version of the statute in place at the time that the activity took place.

[32] That finding was, in turn, supported by the trial testimony of Brian Golembiewski, the plaintiffs' expert witness.

personally liable for clear-cutting the trees on the land trust defendants' property. We disagree.

The following additional procedural history is relevant to our resolution of this claim. At trial, Evans testified that Mellon instructed him to cut "everything" within the 2.5 acres. Mellon testified that he directed Evans to cut all of the trees within the approach slope. Mellon did not specifically recall instructing Evans to cut shrubs, but stated that he took "responsibility for whatever [Evans] cut," and that everything that Evans did was under Mellon's authority.

During trial, the airport defendants filed a motion to dismiss the claims against Mellon personally on the ground that the plaintiffs and the land trust defendants had not established a prima facie case that he had acted in his individual capacity and not merely as a corporate officer of the airport. The trial court denied the motion. In its memorandum of decision, the court found that, "[b]etween November 29 and December 5, 2000, at the direction of Mellon, the owner of the airport, Evans, an independent contractor, clear-cut approximately 2.5 acres of floodplain forest located on land owned by the land trust and land owned by the conservancy." The court rendered judgment against the airport defendants on the plaintiffs' claims pursuant to § 22a-44 (a) and found the airport defendants jointly and severally liable for a civil penalty of $17,500 pursuant to § 22a-44 (b). The court also rendered judgment in favor of the land trust defendants on their claim pursuant to § 22a-16 and, pursuant to § 22a-16a, ordered the airport defendants to make a financial contribution of $50,000 to "an academic or government-funded research project related to environmental protection or conservation of natural resources, which recipient will be identified by the [department of environmental protection]."

It is well established that "an officer of a corporation does not incur personal liability for its torts merely

because of his official position. Where, however, an agent or officer commits or participates in the commission of a tort, whether or not he acts on behalf of his principal or corporation, he is liable to third persons injured thereby." *Scribner* v. *O'Brien, Inc.*, 169 Conn. 389, 404, 363 A.2d 160 (1975); see also *Kilduff* v. *Adams, Inc.*, 219 Conn. 314, 331–32, 593 A.2d 478 (1991) ("[i]t is black letter law that an officer of a corporation who commits a tort is personally liable to the victim regardless of whether the corporation itself is liable"). "Thus, a director or officer who commits the tort or who directs the tortious act done, or participates or operates therein, is liable to third persons injured thereby, even though liability may also attach to the corporation for the tort." 18B Am. Jur. 2d 607, Corporations § 1629 (2004).

Because the issue of whether a corporate officer has committed or participated in the wrongful conduct of a corporation is a question of fact, it is subject to the clearly erroneous standard of review. See *Sargent* v. *Smith*, 272 Conn. 722, 728, 865 A.2d 1129 (2005). "[A reviewing court] cannot retry the facts or pass upon the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Id., 728–29.

We conclude in the present case that the trial court's determination that Mellon personally directed Evans to clear-cut the trees is amply supported by the record. Accordingly, we conclude that the trial court properly determined that Mellon was personally liable for cutting the trees under §§ 22a-44 (b) and 22a-16a. See *Scribner* v. *O'Brien, Inc.*, supra, 169 Conn. 404. It is immaterial

whether Mellon was acting in his individual capacity or on behalf of the corporation. See id.

Mellon makes two arguments in support of his claim to the contrary. First, he argues that his conduct did not fall within the responsible corporate officer doctrine adopted by this court in *BEC Corp.* v. *Dept. of Environmental Protection*, 256 Conn. 602, 618, 775 A.2d 928 (2001). Second, he argues that the application of *Scribner* v. *O'Brien, Inc.*, supra, 169 Conn. 389, to limited liability companies has been superseded by General Statutes § 34-134.[33] We reject both arguments.

In *BEC Corp.* v. *Dept. of Environmental Protection*, supra, 256 Conn. 602, this court considered whether officers of the plaintiff corporation could be held personally liable under the Connecticut Water Pollution Control Act, General Statutes § 22a-416 et seq., for pollution caused by the corporation. We concluded that because General Statutes § 22a-432 defined "person" under the act to include "any officer" of a corporation; (internal quotation marks omitted) id., 617; and because the broad remedial purpose of the act is to "achieve clean water [despite] possible individual hardship"; (internal quotation marks omitted) id., 622; a corporate officer could be held personally liable for the abatement of a violation of the act when: "(1) the officer is in a position of responsibility that allows that officer to influence corporate policies and activities; (2) there is a nexus between the officer's actions or inactions in that position and the violation of § 22a-432 such that the corporate officer influenced the corporate actions that constituted the violation; and (3) the corporate

---

[33] General Statutes § 34-134 provides: "A member or manager of a limited liability company is not a proper party to a proceeding by or against a limited liability company solely by reason of being a member or manager of the limited liability company, except where the object of the proceeding is to enforce a member's or manager's right against or liability to the limited liability company or as otherwise provided in an operating agreement."

officer's actions or inactions resulted in the violation." Id., 618. We emphasized, however, that we were "by no means establishing the responsibility of corporate officers in general with respect to corporate activity; we restrict the application of the responsible corporate officer doctrine solely to violations of the act." Id.

In the present case, the airport defendants argue that, because § 22a-38 (2)[34] does not define "person" to include corporate officers, and because we limited the application of the responsible corporate officer doctrine to § 22a-432 in *BEC Corp.*, Mellon cannot be held personally liable. We are not persuaded. Section 22a-432 is a strict liability statute; see *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, 253 Conn. 661, 670, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001); and the responsible corporate officer doctrine that we adopted in *BEC Corp.* was based on a case imposing liability on corporate officers for strict liability public welfare offenses. See *BEC Corp.* v. *Dept. of Environmental Protection*, supra, 256 Conn. 618, citing *Matter of Dougherty*, 482 N.W.2d 485, 490 (Minn. App. 1992). Moreover, the responsible corporate officer doctrine that we adopted in *BEC Corp.* did not require a finding that the officer had committed, directly participated in or directed the conduct that resulted in a violation before he could be held personally liable, but required only that the officer have a position of responsibility and influence from which he could have prevented the corporation from engaging in the conduct. We conclude, therefore, that the responsible corporate officer doctrine that we adopted in *BEC Corp.*, and any limitations on that doctrine, apply solely to a corporate officer's

[34] General Statutes § 22a-38 (2) defines " '[p]erson' " as "any person, firm, partnership, association, corporation, limited liability company, company, organization or legal entity of any kind, including municipal corporations, governmental agencies or subdivisions thereof . . . ."

personal liability for strict liability public welfare offenses committed by the corporation. We did not intend to overrule or abrogate the black letter principle that a corporate officer may be held personally liable for *tortious* conduct in which the officer *directly* participated, regardless of whether the statutory basis for the claim expressly allows liability to be imposed on corporate officers.[35]

We next address the airport defendants' claim with respect to § 34-134. That statute provides in relevant part: "A member or manager of a limited liability company is not a proper party to a proceeding by or against a limited liability company solely by reason of being a member or manager of the limited liability company . . . ." General Statutes § 34-134. The airport defendants argue that this statute, which was enacted in 1993; see Public Acts 1993, No. 93-267, § 20; supersedes the principle that officers of corporations may be held personally liable for their conduct on behalf of a company in certain circumstances as that principle applies to limited liability companies. See *Scribner* v. *O'Brien, Inc.*, supra, 169 Conn. 404. We disagree. "Although the legislature may eliminate a common law right by statute, the presumption that the legislature does not have such a purpose can be overcome only if the legislative intent is clearly and plainly expressed." (Internal quotation marks omitted.) *Matthiessen* v. *Vanech*, 266 Conn. 822, 838–39, 836 A.2d 394 (2003). Section 34-134 evinces no legislative intent to eliminate the right to impose liability on a member or manager of a limited liability company who has engaged in or participated in the commission of tortious conduct. Rather, the statute merely codifies the well established principle that "an officer of a corporation does not incur personal liability for its torts *merely because of his official position.*"

---

[35] The airport defendants make no claim that a violation of § 22a-16 or § 22a-42a does not constitute tortious conduct.

(Emphasis added.) *Scribner* v. *O'Brien, Inc.*, supra, 404. Accordingly, we reject the airport defendants' arguments that the principle that corporate officers are personally responsible for their own tortious conduct does not apply in this case.

V

We next address the claim of the plaintiffs on cross appeal that the trial court improperly failed to exercise its jurisdiction to order the airport defendants to restore the land trust defendants' properties to their condition prior to the violation of § 22a-44 (a) or to impose a civil penalty sufficient to fund the restoration of the properties. We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. Christopher Allan, a senior associate with Land Tech Consultants and an expert witness for the plaintiffs, testified that restoration of the properties would require planting new trees and shrubs and fencing each tree and shrub individually to protect them from deer. He estimated that the cost of the restoration would be $158,092. Sigrun Gadwa, the principal ecologist for REMA Ecological Services and an expert witness for the airport defendants, testified that Allan's plan could be implemented for a cost of at least 20 percent less.

The airport defendants began their clear-cutting operation on November 29, 2000. Thirty-five days later, on January 2, 2001, Ventres issued a cease and desist order prohibiting the airport defendants from engaging in any further regulated activity at the site.

General Statutes § 22a-44 (b) provides in relevant part that "[a]ny person who commits . . . any violation of any provision of sections 22a-36 to 22a-45, inclusive, including regulations . . . promulgated by municipalities or districts pursuant to the grant of authority herein

contained, shall be assessed a civil penalty of not more than one thousand dollars for each offense. Each violation of said sections shall be a separate and distinct offense, and, in the case of a continuing violation, each day's continuance thereof shall be deemed to be a separate and distinct offense. . . ." Pursuant to this statute, the trial court imposed a civil penalty of $500 per day for each of the thirty-five days between November 29, 2000, and January 2, 2001, for a total of $17,500. The court declined to order the airport defendants to perform any restorative work because "no party proposes a replication of the conditions which existed before the clear-cutting occurred,"[36] because "the land upon which such action would occur is owned by others" and because the court addressed the issue of restoration in connection with the land trust defendants' claims pursuant to § 22a-16. As we have indicated, the trial court ordered the airport defendants to make a financial contribution of $50,000 pursuant to § 22a-16a, which provides that "under any provision of [title 22a] which provides for a civil or criminal penalty for a violation of such provision, the court, in lieu of any other penalties, damages or costs awarded, or in addition to a reduced penalty, damages or costs awarded, may order the defendant . . . (3) to make a financial contribution to an academic or government-funded research project related to environmental protection or conservation of natural resources . . . ." The court stated that "[i]t is expected that the [department of environmental protection] will identify a recipient connected to the Chapman's Pond preserve, if possible."

The plaintiffs argue on appeal that trial court's decision to assess $17,500 in civil penalties and not to order

---

[36] The plaintiffs' experts did not propose returning the land to the condition that it was in before the clear-cutting because, as the trial court found, "invasive species, such as ailanthus trees, had already established themselves at this site for many years, and it is highly desirable ecologically to eradicate such invaders and replace them with native species."

the airport defendants to restore the properties was an abuse of discretion because "[t]here was simply no testimony from which the court could conclude that $17,500 was sufficient to restore" the land to the condition it was in before the clear-cutting, and because § 22a-44 (b) contemplates that penalties "shall be used . . . (1) to restore the affected wetlands or watercourses to their condition prior to the violation, wherever possible . . . ." They further argue that, pursuant to General Statutes § 22a-20,[37] the $50,000 contribution ordered by the trial court pursuant to § 22a-16a (3) was supplemental to the civil penalty ordered pursuant to § 22a-44 (b), not in lieu of it, and, therefore, should not be considered in determining whether the penalty was sufficient. The airport defendants counter that the trial court reasonably found that the plaintiffs' proposed restoration plan was excessive because it did not contemplate restoring the land to its original condition, but to an improved condition. They further argue that the trial court intended the $50,000 contribution to be part of the penalty for violating § 22a-44.

"A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion." (Internal quotation marks omitted.) *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, 259 Conn. 592, 598, 790 A.2d 1178 (2002).

This court has not previously had occasion to consider the scope of the trial court's discretion in ordering

---

[37] General Statutes § 22a-20 provides in relevant part: "Sections 22a-14 to 22a-20, inclusive, shall be supplementary to existing administrative and regulatory procedures provided by law and in any action maintained under said sections, the court may remand the parties to such procedures. . . ."

a civil penalty pursuant to § 22a-44 (b). Generally, in the absence of any specific guidance from the legislature,[38] a civil penalty provision vests wide discretion in the court to determine a fair and proper penalty. See *Carothers* v. *Capozziello*, 215 Conn. 82, 103, 574 A.2d 1268 (1990).[39]

As the airport defendants point out, the trial court determined that the restoration plan proposed by the plaintiffs' expert would not have restored the land to its prior condition, but would have improved the condition of the land. The plaintiffs have not disputed that finding. We conclude that the court was not required to create and impose on the airport defendants a plan of its own to restore the land to its condition prior to the violation. Nor was it required to issue a general

[38] The plaintiffs argue that the trial court's discretion to impose civil penalties is limited by subdivision (1) of § 22a-44 (b), which provides that civil penalties imposed pursuant to that statute "shall be used solely . . . to restore the affected wetlands or watercourses to their condition prior to the violation, wherever possible . . . ." We disagree. That language merely provides that any penalties that are assessed should be used to restore the wetlands. It does not require the court to impose a penalty that is sufficient to restore the wetlands.

[39] We previously have held that, in assessing penalties under other civil penalty provisions of title 22a that provide no specific guidance to the court, the factors to be considered by the court "include, but are not limited to: (1) the size of the business involved; (2) the effect of the penalty or injunctive relief on its ability to continue operation; (3) the gravity of the violation; (4) the good faith efforts made by the business to comply with applicable statutory requirements; (5) any economic benefit gained by the violations; (6) deterrence of future violations; and (7) the fair and equitable treatment of the regulated community." *Carothers* v. *Capozziello*, supra, 215 Conn. 103–104 (listing factors to be considered in imposing civil penalty pursuant to General Statutes § 22a-226 pertaining to penalty for violation of solid waste management statutes); see also *Rocque* v. *Farricielli*, 269 Conn. 187, 210, 848 A.2d 1206 (2004) (factors listed in *Carothers* are to be considered in imposing civil penalties pursuant to General Statutes §§ 22a-226a [governing penalties for violation of selected solid waste management statutes] and 22a-438 [a] [governing penalties for violation of water pollution control statutes]). None of the parties argue that these factors should apply in the present case, however, and the trial court did not identify the factors that entered into its calculations.

order to the airport defendants that they restore the land to its prior condition, which almost certainly would have led to additional litigation. Accordingly, we conclude that the trial court did not abuse its discretion in declining to order the airport defendants to restore the land.

We also reject the plaintiffs' argument that the $50,000 contribution imposed pursuant to § 22a-16a (3) was supplemental to the $17,500 penalty imposed pursuant to § 22a-44 (b), not in lieu of it, and, therefore, should not be considered in determining whether the trial court abused its discretion. Section 22a-16a specifically provides that any financial contribution ordered pursuant to that statute is *"in lieu* of any other penalties, damages or costs awarded, or in addition to a *reduced* penalty, damages or costs awarded" under any other provision of title 22a that provides for a civil penalty. (Emphasis added.) Accordingly, we reasonably may conclude that, if the court had not ordered the financial contribution pursuant to § 22a-16a, the civil penalty pursuant to § 22a-44 (b) would have been greater. In addition, the court expressed its expectation that the entire $67,500 would be used to improve the condition of the land trust defendants' properties. The plaintiffs make no claim that the imposition of a civil penalty of $67,500 would have been an abuse of discretion. As we have indicated, the trial court reasonably could have concluded that the plaintiffs' expert's estimated cost of restoration was excessive because the plan would not have restored the land to its previous condition, but would have improved the condition. Accordingly, we conclude that the trial court did not abuse its discretion in imposing a civil penalty of $17,500 pursuant to § 22a-44 (b).

## VI

We next address the plaintiffs' claim on cross appeal that the trial court improperly suspended the calcula-

tion of per diem civil penalties upon the commission's issuance of the cease and desist order. We disagree.

The following additional facts are relevant to our resolution of this issue. As we have indicated, on January 2, 2001, Ventres issued an order to the airport defendants ordering them to cease and desist from all regulated activity on the airport property and on the land trust defendants' properties. The order identified the prohibited regulated activity as "clear-cutting of a flood plain forest . . . and disturbance of the flood plain soils around the tidal inlet at the end of the property . . . ." The order stated that "[s]atisfactory corrective measures are not to be done without a permit from the [c]ommission" and required the airport defendants to appear at a hearing on January 11, 2001, to show cause why the order should not remain in effect. Because several commission members had recused themselves from the matter, however—apparently because the airport defendants had alleged a conflict of interest—no quorum was available on the date of the hearing. At a June 11, 2001 commission meeting on a related matter, counsel for the airport defendants withdrew the conflict of interest claim as to two of the three commission members who had recused themselves.[40] The cease and desist hearing was never rescheduled, however, and the plaintiffs never issued any order to the airport defendants to correct the condition of the land trust defendants' land. See General Statutes § 22a-44 (a) (inland wetlands agency is authorized to issue order to correct condition created by violation of act).

---

[40] The airport defendants represent in their brief that the June 11, 2001 meeting concerned an application submitted by the airport to extend its runway. They argue that they did not intend to withdraw their motion to disqualify the commission members in proceedings on the pending cease and desist order. We need not decide whether the commission members were recused after June 11, 2001, however, because the issue is irrelevant to our analysis.

As we have indicated, the trial court imposed a $500 per diem fine on the airport defendants for the thirty-five days between the day that they began cutting the trees on the land trust defendants' properties, November 29, 2000, and the day that the cease and desist order was issued, January 2, 2001. The court reasoned that, because the order was never lifted, it prevented "the airport defendants from implementing any corrective or remedial plan because such action would necessarily involve the removal and deposition of material at the site and would alter wetlands, albeit for environmentally beneficial purpose." The plaintiffs argue that the trial court improperly limited the per diem penalties to the thirty-five day period because the cease and desist order did not prevent the airport defendants from submitting a restoration plan to the commission. They further argue that, because they requested restoration of the land in their complaint, which listed a return date of May 8, 2001, and because the airport defendants made no effort to submit a restoration plan up to the date of the court's decision, May 21, 2004, the trial court should have imposed civil penalties for that entire period.

We conclude that the plaintiffs' argument is flawed in several respects. First, § 22a-44 (b) authorizes the imposition of civil penalties for violations of the act. In the present case, the violation consisted of clear-cutting the properties. The plaintiffs have provided no authority for the proposition that the statute authorizes the imposition of civil penalties for the failure to remediate such violations in the absence of any administrative or court order to do so. Moreover, whether the airport defendants were required to restore the properties and, if so, the nature and scope of any such work, were the very issues in dispute in the litigation initiated by the plaintiffs. The plaintiffs have provided no authority for the proposition that, during the pendency of the action,

the airport had a duty under the act to submit a restoration plan. We conclude, therefore, that it was not an abuse of discretion for the trial court to limit the per diem penalties to the period during which the violation occurred and to decline to impose per diem penalties for the period during which the action was pending.

## VII

We next address the land trust defendants' claim on cross appeal that the trial court improperly struck their cross claim under CUTPA. We disagree.

The following procedural history is relevant to our resolution of this issue. The land trust defendants alleged in the fifth count of their cross claim that: (1) the airport defendants had violated CUTPA by threatening expensive and protracted litigation "in an attempt to stifle the [land trust] and its individual volunteer members' participation in government process"; (2) Mellon had a history of using bad faith litigation to further his business interests and had initiated litigation against the members of the land trust board in an effort to "squelch opposition"; and (3) the trees were clear-cut to facilitate the expansion of the airport's runway, which otherwise would not have been permitted, and directly injured the land trust defendants' business interests of protecting and preserving property for public enjoyment. The airport defendants filed a motion to strike the CUTPA claim on the grounds that they were merely defending themselves against the action filed by the plaintiffs and that their defense against the action was not their "trade or business." They also argued that the airport defendants had not alleged any facts that would support a claim under CUTPA. The trial court granted the motion to strike on the ground that the land trust defendants were not competitors or customers of the airport defendants.

The land trust defendants now claim that the trial court improperly determined that CUTPA imposes a requirement that the plaintiff be either the defendant's competitor or its customer. They argue that CUTPA protects businesspersons in general, not just consumers and competitors, and that the airport defendants' conduct interfered with their business of protecting natural resources. The airport defendants counter, essentially as an alternate ground for affirmance, that the land trust defendants' claims that the airport defendants were using litigation to intimidate and stifle the participation of the land trust and its volunteers in government process and that Mellon had a history of initiating baseless litigation to further his business interests are entirely without factual basis and, in any event, cannot support a CUTPA claim as a matter of law. The airport defendants do not address the claim that clear-cutting the land trust defendants' land to advance their own business interest in facilitating the expansion of the runway was a CUTPA violation.

"The standard of review in an appeal challenging a trial court's granting of a motion to strike is well established. A motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court. As a result, our review of the court's ruling is plenary. . . . We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied." (Citations omitted; internal quotation marks omitted.) *Jewish Home for the Elderly of Fairfield County, Inc.* v. *Cantore*, 257 Conn. 531, 537–38, 778 A.2d 93 (2001).

"[General Statutes §] 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct

of any trade or commerce. It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, 250 Conn. 334, 367–68, 736 A.2d 824 (1999).

"[W]e previously have stated in no uncertain terms that CUTPA imposes no requirement of a consumer relationship. In *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, 192 Conn. 558, [566–67], 473 A.2d 1185 (1984), we concluded that CUTPA is not limited to conduct involving consumer injury and that a competitor or other business person can maintain a CUTPA cause of action without showing consumer injury." (Internal quotation marks omitted.) *Macomber* v. *Travelers Property & Casualty Corp.*, 261 Conn. 620, 643, 804 A.2d 180 (2002).

With respect to the land trust defendants' allegations that the airport defendants had threatened and actually engaged in oppressive litigation tactics, we conclude that the trial court properly determined that the allegations did not support a CUTPA claim. We note that the allegations are vague in that they do not indicate whether the land trust defendants are claiming that the

airport defendants' litigation conduct in the present case was improper or that they had initiated a separate action against the members of the land trust board. To the extent that the land trust defendants claim that the conduct of the airport defendants in defending themselves from the claims against them in the present action was improper, they have not cited any authority for the proposition that a defendant's vigorous defense against a lawsuit may form the basis for a CUTPA claim in that very lawsuit. Although the land trust defendants make a passing reference in their brief to this court to an action filed by the airport defendants in federal court, they do not discuss the nature or status of that action. We recently have held that claims based on the improper litigation conduct of the defendant in another pending action were properly stricken as duplicative and premature.[41] See *Larobina* v. *McDonald*, 274 Conn. 394, 407–408, 876 A.2d 522 (2005). Likewise, the allegations in the present case would require the trial court to determine the validity of the airport defendants' claims in a separate action that apparently is still pending, thereby giving rise to duplicative litigation and potentially inconsistent verdicts. Accordingly, we conclude that the trial court properly struck these allegations.

With respect to the land trust defendants' claim that the trial court improperly struck their allegation that the airport defendants' violated CUTPA by clear-cutting

[41] The Appellate Court has suggested in dicta that "a party's use of its economic powers in an attempt to stifle individual citizens' use of valid governmental processes by threat of expensive litigation potentially constitutes a violation of CUTPA, which is expressly modeled on § 5 (a) (1) of the Federal Trade Commission Act, 15 U.S.C. § 45 (a) (1)." *Zeller* v. *Consolini*, 59 Conn. App. 545, 562 n.7, 758 A.2d 376 (2000). In *Zeller*, the defendants *initiated* the sham litigation, in which the plaintiff ultimately prevailed. Id., 547–48. The court, in *Zeller*, did not indicate that conduct in *defending* a lawsuit or conduct in a separate *pending* action could form the basis of a CUTPA claim.

their land to advance their business interest in expanding the runway, the land trust defendants argue that this court expressly has held that CUTPA does not require the existence of a consumer relationship and implicitly has held that a competitor relationship is not necessary. See *Macomber* v. *Travelers Property & Casualty Corp.*, supra, 261 Conn. 643 (upholding CUTPA claim where plaintiffs were neither consumers nor competitors of defendant). The land trust defendants argue that the cigarette rule "encompasses businesspersons in general," that they are in the business of protecting natural resources, and that they are "competing [with the airport defendants] for the airspace that the trees had occupied." We are not persuaded. Even if we assumed that the land trust defendants are in the business of protecting natural resources, we cannot conclude that the interference with that business by a trespasser constitutes an unfair trade practice. Such a conclusion would convert every trespass claim involving business property into a CUTPA claim. We also reject the land trust defendants' claim that they are "competing" with the airport defendants for the rights to the airspace over their properties. The relationship between the land trust defendants and the airport defendants cannot be characterized as competitive in any ordinary business sense. Rather, before the clear-cutting, the relationship was merely one of neighboring landowners. After the clear-cutting, the relationship was one of landowner and trespasser. Accordingly, we reject the land trust defendants' argument that they had a business relationship with the airport defendants.

The land trust defendants argue, alternatively, that a CUTPA plaintiff is not required to allege any business relationship with the defendant. They have provided no authority, however, for that proposition. Cf. *Macomber* v. *Travelers Property & Casualty Corp.*, supra, 261 Conn. 626 (plaintiffs were not consumers or competi-

tors of defendant, but had entered into settlement agreements with defendant). Accordingly, we reject this argument. We conclude that the trial court properly determined that the land trust defendants' allegation that the airport defendants violated CUTPA by clear-cutting their land to advance their business interest in expanding the runway is insufficient to support a CUTPA claim, and, therefore, that the court properly granted the motion to strike the CUTPA claim.

## VIII

Finally, we address the claim of the land trust defendants on cross appeal that the trial court improperly determined that they were precluded from introducing evidence concerning the replacement value of the trees in support of their claim for damages pursuant to § 52-560. We disagree.

The following additional procedural history is relevant to our resolution of this claim. The land trust defendants claimed in the second count of their cross claim that the airport defendants had intentionally trespassed on their property and had intentionally destroyed their trees, entitling them to treble damages under § 52-560. At trial, the land trust defendants did not introduce any evidence as to the value of the trees as cut wood or as to the diminution of the value of their land as a result of the clear-cutting. Instead, they asked the trial court to award treble damages under § 52-560 based on the replacement value of the trees and submitted a report by Bruce Spaman, an arboriculture and forestry consultant with Forest Management Services, estimating that the cost of replacement would be between $203,400 and $220,350.

The trial court concluded that the claim was precluded by the Appellate Court's decision in *Stanley* v. *Lincoln*, 75 Conn. App. 781, 818 A.2d 783 (2003). In that case, the Appellate Court stated that "[t]here are three

possible measure of damages for loss of a tree in Connecticut." (Internal quotation marks omitted.) Id., 785. In an action for trespass that alleges the loss of trees, "[i]t is an appropriate remedy either for the recovery of damages for the mere unlawful entry upon the plaintiff's land; for the recovery of the value of the trees removed, considered separately from the land; or for the recovery of damages to the land resulting from the special value of the trees as shade or ornamental trees while standing on the land. For a mere unlawful entry upon land nominal damages only would be awarded. If the purpose of the action is only to recover the value of the trees as chattels, after severance from the soil, the rule of damages is the market value of the trees for timber or fuel. For the injury resulting to the land from the destruction of trees which, as a part of the land, have a peculiar value as shade or ornamental trees, a different rule of damages obtains, namely, the reduction in the pecuniary value of the land occasioned by the act complained of. . . .

"This common-law rule has been embodied in § 52-560 . . . . That statute does not give a new and independent cause of action, but prescribes the measure of damages in cases where compensatory damages would, in the absence of the statute, be recoverable." (Citations omitted; internal quotation marks omitted.) Id., 785–86.

"[R]eplacement value is not a proper measure of damages in tree cutting cases because [s]uch a measure of damages . . . would lead to unreasonable recoveries in excess of the market value of the land . . . would raise impossible issues in resolving the replacement values of healthy or partially damaged trees . . . [and] cannot be practically applied." (Internal quotation marks omitted.) Id., 789 n.7, quoting *Maldonado* v. *Connecticut Light & Power Co.*, 31 Conn. Sup. 536, 539, 328 A.2d 120 (1974). Although the court in *Maldonado* concluded that the cost of replacing the trees was not

a proper measure of damages, it stated that "[i]t is . . . well established that [the diminution in property value as a result of cutting the trees] may be determined by the cost of repairing the damage, provided, of course, that that cost does not exceed the former value of the property and provided also that the repairs do not enhance the value of the property over what it was before it was damaged." (Internal quotation marks omitted.) *Maldonado* v. *Connecticut Light & Power Co.*, supra, 539.

In order to resolve this claim, it is necessary to clarify the Appellate Court's ruling in *Stanley*. The Appellate Court suggested in that case that the common-law rule that the diminution in property value is a proper measure of damages in tree cutting cases had been embodied in § 52-560. *Stanley* v. *Lincoln*, supra, 75 Conn. App. 786. The court also suggested that, under the common law, the replacement value of the trees was not a proper measure of damages and, therefore, was not a proper measure of damages under § 52-560. See id., 788–89. We do not entirely agree with this analysis. Rather, we conclude that, although damages for the reduction in pecuniary value of the land—determined by the replacement cost of the trees, if appropriate—were available under the common law,[42] the plain language of § 52-560 authorizes treble damages only for the value of the trees as commodities, not for the reduction in the pecuniary value or for the replacement cost of the trees. "We are not permitted to supply statutory language that the legislature may have chosen to omit." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 119, 830 A.2d 1121 (2003). Accordingly, we conclude that the trial court properly determined that replacement

---

[42] The land trust defendants made no such claim under the common law. Accordingly, there is no need to decide in this case whether the enactment of § 52-560 preempted a common-law cause of action.

cost was not a proper measure of damages under § 52-560.

The land trust defendants argue, however, that this court should "recognize an exception to the limitation on damages set forth in [*Stanley*]" and permit damages to be calculated on the basis of the replacement cost of the trees when "the value of the property lies in its place within the environment, rather than as a potential building lot or a working woodlot." As we have indicated, however, the plain language of the statute precludes such a reading. "[This] court is precluded from substituting its own ideas of what might be a wise provision in place of a clear expression of legislative will." (Internal quotation marks omitted.) *Skindzier* v. *Commissioner of Social Services*, 258 Conn. 642, 661, 784 A.2d 323 (2001). Accordingly, we decline to read into § 52-560 the exception urged by the land trust defendants.

The judgment is affirmed.

In this opinion the other justices concurred.